## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | :: | |
| | :: | CRIMINAL CASE NO. |
| v. | :: | 1:21-cr-00454-WMR-RGV |
| | :: | |
| PATRICK SHACKELFORD, | :: | |
| PATRICK KIRKMAN, and | :: | |
| MITCHELL ARMS | :: | |

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendants Patrick Shackelford ("Shackelford"), Patrick Kirkman ("Kirkman"), and Mitchell Arms ("Arms")[1] are charged in a nine-count criminal indictment with conspiracy to commit bribery, in violation of 18 U.S.C. § 371; conspiracy to provide and obtain and possess prohibited objects, in violation of 18 U.S.C. § 371; bribery, in violation of 18 U.S.C. § 201(b)(2)(A); providing prohibited objects, in violation of 18 U.S.C. §§ 1791(a)(1), 1791(b)(1), (3)-(4), 1791(d)(1)(B)-(C), (F), and 2; possessing, obtaining, and attempting to obtain prohibited objects, in violation of 18 U.S.C. §§ 1791(a)(2), 1791(b)(1), (3), 1791(d)(1)(B)-(C), and 2; and

---

[1] According to the indictment, Arms also is known as "Envelope," and Shackelford, Kirkman, and Arms are collectively referred to as "defendants."

drug conspiracy, in violation of 21 U.S.C. § 846. [Doc. 1].[2] Shackelford has filed a motion for bill of particulars, [Doc. 57], which Kirkman has moved to adopt, [Doc. 63], and Shackelford also has filed two motions to dismiss, [Docs. 58 & 59], both of which Kirkman moved to adopt, [Docs. 64 & 65]. The government opposes the motion for a bill of particulars, [Doc. 84], as well as both motions to dismiss, [Docs. 82 & 83]. Finally, Arms has filed a motion to suppress out of court photographic evidence, [Doc. 72], which Kirkman has moved to adopt, [Doc. 75], and the government filed an initial response in opposition, [Doc. 85], to which Arms and Kirkman filed replies in support of the motion, [Docs. 91 & 92]. Following an evidentiary hearing on the motion to suppress evidence on April 14, 2023,[3] the parties filed post-hearing briefs, see [Docs. 137, 140, 145, 146, & 147].[4] For the

---

[2] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[3] See [Doc. 128] for a transcript of the evidentiary hearing held on April 14, 2023, which will be referred to as "(Tr. at __)" and cited according to the page number located in the top right corner of the transcript. In addition, the parties submitted exhibits at the evidentiary hearing, see [Docs. 122, 124, & 126], which will either be referred to as "(Gov't Ex. __)" for the government's exhibits, "(DA Ex. __)" for Arms' exhibits, and "(DK Ex. __)" for Kirkman's exhibits or by the document number.

[4] The government initially timely filed its post-hearing brief, [Doc. 144], but then filed an amended post-hearing brief, [Doc. 145], in order to "clarify one of the government's arguments" and "to correct a few editing/typographical errors[]," [id. at 1 n.1]. The government indicated that counsel for Arms and Kirkman "did

reasons that follow, Kirkman's motions to adopt, [Docs. 63, 64, 65, & 75], are **GRANTED**, Shackelford and Kirkman's motion for bill of particulars, [Doc. 57], is **DENIED**, and it is **RECOMMENDED** that Shackelford and Kirkman's motions to dismiss, [Docs. 58 & 59], and Arms and Kirkman's motion to suppress photographic evidence, [Doc. 72], be **DENIED**.[5]

## I. INTRODUCTION

On November 16, 2021, a federal grand jury in the Northern District of Georgia returned an indictment against the defendants, charging Shackelford and Kirkman with one count of conspiracy to commit bribery, in violation of 18 U.S.C. § 371; all the defendants with one count of conspiracy to provide and obtain and possess prohibited objects, in violation of 18 U.S.C. § 371; Shackelford with one count of bribery, in violation of 18 U.S.C. § 201(b)(2)(A); Shackelford with three counts of providing prohibited objects, in violation of 18 U.S.C. §§ 1791(a)(1), 1791(b)(1), (3)-(4), 1791(d)(1)(B)-(C), (F), and 2; Kirkman and Arms with two counts

---

not oppose the government filing th[e] amended brief." [Id. at 2 n.1]. Thus, the Court will consider the government's amended response in opposition, [Doc. 145], in ruling on the motion to suppress photographic evidence.

[5] Kirkman also filed a motion in limine and request for a hearing pursuant to United States v. James, 590 F.2d 575 (5th Cir. 1979), [Doc. 77]; see also Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (explaining that decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit), which was deferred for ruling to the District Judge, see [Doc. 78].

of possessing, obtaining, and attempting to obtain prohibited objects, in violation of 18 U.S.C. §§ 1791(a)(2), 1791(b)(1), (3), 1791(d)(1)(B)-(C), and 2; and all the defendants with one count of drug conspiracy, in violation of 21 U.S.C. § 846. [Doc. 1].  In particular, the indictment charges that "[b]eginning in or about June 2018 and continuing until in or about February 2019," Shackelford, a Correctional Officer employed by the Federal Bureau of Prisons ("BOP"), who at all times relevant to the indictment "served as a plumbing supervisor" at the United States Penitentiary in Atlanta, Georgia ("USP Atlanta"), overseeing inmates who performed plumbing services throughout USP Atlanta, "facilitated on behalf of inmates, including" Kirkman, Arms, and "Individual-1," the "smuggling of prohibited contraband, including cellular phones, tobacco, and controlled substances, into USP Atlanta."   [Id. ¶¶ 1-7, 9].  The indictment specifies that, "[w]ith Shackelford's knowledge and assistance, inmates working under his direction on the plumbing crew, including Individual-1, were able to smuggle contraband into USP Atlanta from a visitor's bathroom through W-ward," which "was used as the suicide watch unit and was often empty of inmates and staff." [Id. ¶ 10 (emphasis, all caps, and internal marks omitted)].

The indictment specifically alleges that Shackelford, along with inmates under his supervision, "created a person-sized hole in a wall in W-ward, which led to a voided area between W-ward and a visitor's bathroom," and that these

4

inmates then "knocked down another wall to have direct access to the visitor's bathroom" and "made a hole under the sink in the bathroom through which the contraband could be passed into USP Atlanta." [Id.].  Shackelford would then "escort the inmates," including Individual-1 and Individual-2, another inmate at USP Atlanta who worked on the plumbing crew with Individual-1, "to W-ward to pick up the contraband on nearly a weekly basis" in order to distribute the contraband to other inmates.  [Id. ¶¶ 8, 10, 12-13].

The indictment charges that Shackelford "received approximately $5,000 cash as payment for facilitating the smuggling of contraband into USP Atlanta" in January 2019, and that Kirkman "was the source of the funds used to pay [him]." [Id. ¶¶ 14, 16].[6]  It also charges that Shackelford "received pain pills from inmates to facilitate the smuggling of contraband into USP Atlanta," alleging that he received approximately 120 pain pills in October 2018.  [Id. ¶¶ 15-16].  The indictment specifies that Kirkman and other co-conspirators "caused more than 500 grams of methamphetamine and more than 1 kilogram of marijuana to be brought into USP Atlanta through the visitor's bathroom," and that on February 18, 2019, "co-conspirators stored the methamphetamine, marijuana, and cellular

---

[6] The indictment also alleges that Shackelford allowed Individual-1 and Individual-2 "to smuggle contraband into USP Atlanta and subsequently distribute it to other inmates" because those two individuals "would complete his assigned plumbing duties and other work."  [Doc. 1 ¶ 13].

phones in the maintenance office[ ] in the ceiling above Shackelford's office in USP Atlanta." [Id. ¶ 16 (emphasis and all caps omitted)].

The indictment charges Shackelford and Kirkman in Count One with conspiracy to commit bribery, in violation of 18 U.S.C. § 371, based on their knowing and willful agreement "to commit an offense against the United States," by Shackelford's demanding, seeking, receiving, accepting, and agreeing to receive and accept "something of value personally, including monetary payments and other items of value from defendant [] Kirkman, Individual-1, and others at [ USP Atlanta], in return for being influenced in the performance of an official act and being induced to do and omit to do any act in violation of Shackelford's official duties[.]" [Id. ¶¶ 1-16 (emphasis and all caps omitted)]. Count Two charges all the defendants with conspiracy to provide and obtain and possess prohibited objects, in violation of 18 U.S.C. § 371, from about June 2018, and continuing through at least February 2019, alleging as follows:

    a.    in violation of a statute and a rule and order issued under a statute, to provide to inmates of USP Atlanta prohibited objects, namely methamphetamine and marijuana, and attempt to do so; in violation of [18 U.S.C. §] 1791(a)(1); and

    b.    to permit inmates of USP Atlanta to possess, obtain, and attempt to obtain prohibited objects, namely methamphetamine and marijuana, in violation of [18 U.S.C. §] 1792(a)(2).

[Id. ¶¶ 17-18].

6

As overt acts related to this conspiracy count, the indictment realleges allegations that Shackelford and inmates on the plumbing crew created a person-sized hole in a wall in W-ward, as well as created a hole beneath the sink in a visitor's bathroom in order to bring contraband into USP Atlanta in June 2018; that Shackelford received approximately $5,000 cash from co-conspirators in return for his role in the scheme in January 2019; that Kirkman and other co-conspirators caused more than 500 grams of methamphetamine and more than 1 kilogram of marijuana to be brought into USP Atlanta through the visitor's bathroom in February 2019; and that co-conspirators stored the contraband in the ceiling above Shackelford's office in USP Atlanta on February 18, 2019.  [Id. ¶¶ 16, 20].  The indictment also alleges that Kirkman transferred $1,000 via Cash App to Individual-1 on August 3, 2018, that Kirman transferred $1,000 via Cash App to Individual-1 on September 3, 2018, that Kirkman transferred $1,500 via Cash App to Individual-1 on October 6, 2018, that Kirkman transferred $1,000 via Cash App to Individual-1 on November 14, 2018, that Kirkman transferred $1,000 via Cash App to Individual-1 on December 4, 2018, that Kirkman transferred $500 via Cash App to Individual-1 on January 27, 2019, and that Arms sent a text message to Individual-1 "describing the contents of packages coming through the visitor's bathroom containing contraband, including methamphetamine" on February 18, 2019.  [Id. ¶ 20].

Count Three charges Shackelford with bribery, in violation of 18 U.S.C. § 201(b)(2)(A), [id. ¶¶ 21-22], and Counts Four through Six charge Shackelford with knowingly providing USP Atlanta inmates prohibited objects, with Count Four charging the prohibited object as methamphetamine from "at least August 2018 and continuing through at least February 2019," in violation of 18 U.S.C. §§ 1791(a)(1), 1791(b)(1), 1791(d)(1)(C), and 2; Count Five charging the prohibited object as marijuana from "at least August 2018 and continuing through at least February 2019," in violation of 18 U.S.C. §§ 1791(a)(1), 1791(b)(3), 1791(d)(1)(B), and 2; and Count Six charging the prohibited object as cellular phones from "at least June 2018 and continuing through at least February 2019," in violation of 18 U.S.C. §§ 1791(a)(1), 1791(b)(4), 1791(d)(1)(F), and 2, [id. ¶¶ 23-28].  Counts Seven and Eight charge Kirkman and Arms with possessing, obtaining, and attempting to obtain prohibited objects, with Count Seven charging the prohibited object as methamphetamine from about August 2018 to February 2019, in violation of 18 U.S.C. §§ 1791(a)(2), 1791(b)(1), 1791(d)(1)(C), and 2, and Count Eight charging the prohibited object as marijuana from about August 2018 through February 2019, in violation of 18 U.S.C. §§ 1791(a)(2), 1791(b)(3), 1791(d)(1)(B), and 2.  [Id. ¶¶ 29-32].

Count Nine charges all the defendants with a drug distribution conspiracy, in violation of 18 U.S.C. § 846, alleging that from about August 2018, and continuing to about February 2019, defendants knowingly combined, conspired,

and agreed "with each other and other persons known and unknown . . . to violate

[21 U.S.C. §] 841(a)(1), that is, to knowingly and intentionally possess with the

intent to distribute a controlled substance," including as follows:

> a. at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, pursuant to [21 U.S.C. §] 841(b)(1)(A); and

> b. a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance, pursuant to [21 U.S.C. §] 841(b)(1)(D)[.]

[Id. ¶¶ 33-34].[7]  Defendants have filed several pretrial motions, [Docs. 57, 58, 59, &

72], which are now fully briefed and ripe for ruling.

## II.  DISCUSSION

### A.  Motion for Bill of Particulars, [Doc. 57]

Shackelford has filed a motion for a bill of particulars, [Doc. 57], which

Kirkman has moved to adopt, [Doc. 63].  In the motion for bill of particulars, [Doc.

57], Shackelford "asks the Court to require that the government identify the

particulars relating to the alleged 'thing of value' and 'official acts' that form the

basis of Counts [O]ne and Three of the [i]ndictment," [id. at 1].  In his motion to

adopt, [Doc. 63], Kirkman explains that his "motion differs slightly factually

_____

[7] The indictment also contains a prior conviction notice for Kirkman and Arms, [Doc. 1 ¶¶ 35-37], as well as a forfeiture provision, [id. ¶¶ 38-40].

because [] Shackelford is charged in [C]ounts [One through Six] and [Nine] of th[e] indictment," while he "is charged in Counts [One through Two and Counts Seven through Nine] of th[e] indictment," but that his "claims are subject to the same legal analysis and arguments set forth in [] Shackelford's [m]otion," [id. at 1 (citation omitted)].

In his motion, Shackelford argues that the indictment "alleges a conspiracy and a substantive count to engage in a bribery scheme, the object of which was to bring contraband into USP[ Atlanta]," but while the indictment "identif[ies] some activities and some benefits," there are "two alleged distinct types of 'payments[,]'[] and multiple so-called 'official acts,'" and he is therefore "entitled to know with specificity whether he is defending against only the specific 'payments' alleged, or [whether] the [g]overnment will rely on other supposed benefits." [Doc. 57 at 4-5]. He also argues that he is "entitled to know exactly what actions or inactions he supposedly performed were the precise 'official acts' on which the prosecution will rely at trial," and that "[h]e is entitled to know what is meant by the allegation that he 'committed various acts . . . including but not limited to . . .' those outlined already." [Id. at 5]. Shackelford thus "asks [] the Court [to] require the [g]overnment to specifically identify the precise payments and official acts on which it will rely at trial." [Id.]. Similarly, Kirkman posits that "[i]t is essential for defendants to know exactly what they must defend against"

and he therefore requests "the Court to require the [g]overnment to identify precise payments, benefits, official acts, known co-conspirators, persons known, exact quantities and all overt acts on which it will rely on at trial." [Doc. 63 at 4].

In its response in opposition to Shackelford and Kirkman's motion, [Doc. 84], the government maintains that the motion should be denied because "[t]he indictment provides considerable detail regarding the alleged conspiracy to commit bribery" by specifically providing the relevant time period during which the conspiracy occurred; that Shackelford was a plumbing supervisor responsible for overseeing a group of inmates providing plumbing services at USP Atlanta; details on how two inmates on Shackelford's plumbing crew, Individual-1 and Individual-2, whose identities are known to defense counsel, and Shackelford, brought prohibited objects into USP Atlanta; that Shackelford received several specific benefits in exchange for his role in the scheme, including completion of his work duties by inmates, $5,000 in cash, and pain pills; and multiple overt acts taken in furtherance of the bribery conspiracy, [id. at 3-4 & n.2 (citations omitted)]. The government also points out that the substantive bribery count in Count Three "incorporates these allegations by reference, as well as the overt acts underlying the conspiracy to provide and possess prohibited objects . . . in USP Atlanta." [Id. at 4 (citation omitted)].

The government therefore maintains that the "indictment's allegations (as well [as] the discovery already provided to defense counsel) outline in significant detail the factual basis underlying the bribery and conspiracy to commit bribery offenses," pointing out that it "specifically alleges Shackelford's actions of using his official position as a USP Atlanta corrections officer—and in particular as the then-plumbing supervisor—to facilitate the smuggling of contraband . . . into USP Atlanta in exchange for items of value, namely $5,000 cash, pills, and for the inmates to complete his assigned job responsibilities," and that the "request for a bill of particulars is in effect little more than an effort to obtain additional details for how the government intends to introduce, present, and characterize the known evidence at trial and to prematurely discover and lock the government into a specific legal theory for the case," which "is not allowed through a bill of particulars."  [Id. at 6-7 (citations omitted)].  The government further maintains that Kirkman's request for the government to "identify precise payments, benefits, official acts, known co-conspirators, persons known, exact quantities[,] and all overt acts on which it will rely on a[t] trial" is also "wholly improper," since a "bill of particulars may not be used for the purpose of obtaining a detailed disclosure of the [g]overnment's evidence in advance of trial" and the government is not "required to provide defendants with all overt acts that might be proven at trial." [Id. at 8 (first alteration in original) (citations and internal marks omitted)].

Accordingly, the government contends that "[b]ecause Shackelford and Kirkman appear to want the government . . . to prematurely disclose and commit to how exactly it will present evidence and its legal theories at trial[, ] their motions for a bill of particulars should be denied."  [Id. at 10].

Rule 7(f) of the Federal Rules of Criminal Procedure provides that the Court "may direct the government to file a bill of particulars."  Fed. R. Crim. P. 7(f).  "The purpose of a true bill of particulars is threefold: 'to inform the defendant[s] of the charge against [them] with sufficient precision to allow [them] to prepare [their] defense, to minimize surprise at trial, and to enable [them] to plead double jeopardy in the event of a later prosecution for the same offense.'"  United States v. Reddy, Criminal Action File No. 1:09-CR-0483-ODE/AJB, 2010 WL 3210842, at *5 (N.D. Ga. Apr. 5, 2010) (quoting United States v. Cole, 755 F.2d 748, 760 (11th Cir. 1985)), adopted as modified by 2010 WL 3211029, at *7 (N.D. Ga. Aug. 11, 2010); see also United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981) (citations omitted); United States v. Zellner, Criminal Indictment No. 1:09-CR-320-TCB-GGB, 2011 WL 530718, at *9 (N.D. Ga. Jan. 14, 2011) (citation omitted), adopted sub nom. United States v. Chester, Criminal Action File No. 1:09-cr-320-TCB-GGB, 2011 WL 529952, at *1 (N.D. Ga. Feb. 4, 2011).  Generalized discovery is not a valid reason for seeking a bill of particulars, Colson, 662 F.2d at 1391 (citation omitted); United States v. Davis, 582 F.2d 947, 951 (5th Cir. 1978), and "[a] bill of

particulars may not be used for the purpose of obtaining detailed disclosure of the government's case or evidence in advance of trial," Zellner, 2011 WL 530718, at *9 (citation omitted).  Moreover, Shackelford and Kirkman are not entitled to a bill of particulars describing information which is already evident from other sources, such as elsewhere in the indictment or in discovery.  United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir. 1986) (citation omitted), modified on other grounds by, 801 F.2d 378 (11th Cir. 1986); see also Reddy, 2010 WL 3210842, at *5 (citation omitted).  Further, "[w]hen a court analyzes the sufficiency of an indictment, it reviews the indictment as a whole and give[s] it a common sense construction." United States v. Mitchell, CRIMINAL CASE NO. 1:17-CR-122-LMM-LTW, 2019 WL 6462838, at *22 (N.D. Ga. June 25, 2019) (last alteration in original) (citation and internal marks omitted), adopted by 2019 WL 3854307, at *3 (N.D. Ga. Aug. 16, 2019).  And, the "level of detail in the indictment can be a basis for denying the motion for a bill of particulars."  United States v. Valdez-Morales, No. 3:15-CR-56, 2016 WL 919029, at *3 (E.D. Tenn. Mar. 4, 2016) (citation omitted).

In this case, the "conspiracy count[s] of the [i]ndictment . . . sufficiently allege[] [those] charge[s] by stating the elements of the offense[s] charged therein and by providing details regarding the manner and means . . . by which [Shackelford and Kirkman] participated in the charged conspiracy."  United States v. Greenhill, CRIMINAL CASE NO. 1:18-CR-00108-MHC-JFK, 2018 WL 5659933,

at *2 (N.D. Ga. Sept. 20, 2018) (citation omitted), adopted by 2018 WL 5649898, at *1 (N.D. Ga. Oct. 31, 2018).  Indeed, as the government points out, [Doc. 84 at 6-7], the indictment specifies that Shackelford used his official position as a plumbing supervisor at USP Atlanta to facilitate the smuggling of contraband into USP Atlanta in exchange for $5,000 cash, pain pills, and inmates completing his assigned job responsibilities; that he allowed inmates, including Kirkman and Arms, to distribute contraband to others; that Kirkman was the source of the funds used to pay Shackelford approximately $5,000 in cash; that Shackelford received approximately 120 pain pills in exchange for his role in the scheme; that on six specific occasions, Kirkman transferred various amounts of cash via Cash App to Individual-1; and that Kirkman, along with other co-conspirators, caused more than 500 grams of methamphetamine and more than 1 kilogram of marijuana to be smuggled into USP Atlanta, see generally [Doc. 1].  The indictment tracks the statutory language of the offenses charged, informing Shackelford and Kirkman of the essential elements of the offense.  See [id.].  That is, the indictment "cites 18 U.S.C. § 1791(a)(1)[-(2)] . . . and it provides examples of prohibited materials," while "also list[ing] overt acts involving the exchange of contraband for [money, pills, and having his assigned tasks performed for him.]"  United States v. Dixon, Case No. 4:06cr36-RH/WCS, 2006 WL 8446871, at *2 (N.D. Fla. Oct. 18, 2006) (footnote omitted).  "The language charging bribery and conspiracy to commit

bribery correctly tracks the standard elements of each offense," and the "descriptions and citations are sufficient." Id.

Shackelford moves the Court to order the government to file a bill of particulars, identifying the precise payments and official acts upon which the government will rely at trial, [Doc. 57 at 5], while Kirkman requests the Court to require the government to "identify precise payments, benefits, official acts, known co-conspirators, persons known, exact quantities and all overt acts on which it will rely on at trial," [Doc. 63 at 4], but Shackelford and Kirkman are "not entitled to a bill of particulars with respect to information which is already available through other sources such as the indictment and discovery," Mitchell, 2019 WL 6462838, at *19 (citations omitted); see also United States v. Jackson, CRIMINAL ACTION FILE NO. 1:16-CR-427-AT-JKL-8, 2019 WL 7842416, at *3 (N.D. Ga. Aug. 29, 2019) (citation omitted), adopted by 2019 WL 6769233, at *2 (N.D. Ga. Dec. 12, 2019), and "[a] bill of particulars is not a substitute for discovery," Dixon, 2006 WL 8446871, at *3 (citation omitted).  Indeed, while Shackelford and Kirkman ask the Court to order the government to identify all "things of value" and all "official acts," [Doc. 57 at 3 (internal marks omitted); Doc. 63 at 2, 4], the indictment and "[d]iscovery fleshes out the details of the [g]overnment's case and therefore equips [them] with information [they] need[] to

mount a defense," United States v. Burke, Case No. 19-cr-322, 2022 WL 1970189, at *77, 82 (N.D. Ill. June 6, 2022).

Moreover, Shackelford and Kirkman's requests "seek[] evidentiary detail . . . that is not appropriate in a bill of particulars."  Greenhill, 2018 WL 5659933, at *3 (citations omitted).  That is, "there is a difference between being surprised by the charge and being surprised by the evidence supporting a charge," and "[t]he function of the bill of particulars is to reduce surprise at the charge, that is, to enable the defendant[s] to identify what [they are] alleged to have done in violation of law," but "[i]t is not to eliminate surprise with respect to evidence offered in support of a charge that is clearly understood by the defendant[s]." United States v. Scrushy, Case No. CR-03-BE-530-S, 2004 WL 483264, at *9 n.5 (N.D. Ala. Mar. 3, 2004) (emphasis omitted).  In fact, "Rule 7 does not give a defendant the right to insist that he be made aware of all of the evidence the [g]overnment may use against him so that he literally is not 'surprised' by anything at trial," id., as "[a] bill of particulars  . . . is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial," United States v. Roberts, 174 F. App'x 475, 477 (11th Cir. 2006) (per curiam) (unpublished) (citation and internal marks omitted); see also United States v. Baitcher, Criminal Action File No. 1:11-CR-536-SCJ-AJB, 2013 WL 1501462, at *2 (N.D. Ga. Mar. 22, 2013) (footnote and citations omitted) ("A bill of particulars may

17

be obtained to clarify an indictment, as long as it does not seek to determine in advance the government's proof."), adopted by 2013 WL 1501454, at *1 (N.D. Ga. Apr. 11, 2013); United States v. Wimbley, Criminal No. 11-0019-WS, 2011 WL 3204539, at *2 (S.D. Ala. July 27, 2011) (citations omitted) ("Defendants are not entitled to a bill of particulars as a . . . comprehensive preview of the [g]overnment's trial proof or theories."); United States v. Perez, No. CR 106-029, 2006 WL 1737449, at *3 (S.D. Ga. June 19, 2006) (citation omitted) ("Nor is [a bill of particulars] intended to secure for the defense the government's explanation of its theory of the case."), adopted at *1.

The indictment is detailed and "legally sufficient," United States v. Bickers, CRIMINAL INDICTMENT. NO. 1:18-CR-98-SCJ-LTW, 2019 WL 7559292, at *8 (N.D. Ga. Sept. 17, 2019), adopted by 2019 WL 5587050, at *7 (N.D. Ga. Oct. 30, 2019), as it describes the object and manner and means of the alleges conspiracy and bribery scheme, as well as the role of each co-conspirator in the scheme, see [Doc. 1].  In addition, "contrary to [Kirkman's] request in this case, [c]ase law is also clear that the [g]overnment is not required to identify . . . specific acts or overt acts done in furtherance of a charged conspiracy by particular defendants." Greenhill, 2018 WL 5659933, at *3 (second and fourth alterations in original) (citations and internal marks omitted); see also United States v. Jimenez, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) (citations omitted) (explaining that while

"defendants [] request the 'whens' 'wheres' and 'with whoms' of acts and participation," "[p]retrial motions for such information are routinely denied" and that "disclosure of all the overt acts in furtherance of [a] conspiracy is not properly the function of a bill of particulars"). Indeed, "[i]n a case where the evidence being sought by a bill of particulars consists of activities in which a defendant participated or witnessed, the defendant could hardly have been surprised by the government's proof at trial." Greenhill, 2018 WL 5659933, at *3 (citations and internal marks omitted); see also United States v. Martin, CRIMINAL INDICTMENT NO. 1:16-cr-00218-LMM-RGV, 2016 WL 11489244, at *6-7 (N.D. Ga. Nov. 16, 2016) (alterations, citations, and internal marks omitted) (explaining that defendant was "the only individual who allegedly received a bribe payment from [his co-defendant], and when particulars are sought with respect to events in which one or more of the defendants participated, or which occurred in one or more of the defendants' presence, the Eleventh Circuit has held that this sort of information need not be furnished in a bill of particulars," and that defendant was therefore not entitled to a bill of particulars as to the date and amount of the alleged bribe payment he made to his co-defendant where the indictment alleged that he paid the co-defendant "at least $1,000" in or about 2014), adopted sub nom. United States v. Shannon, CIVIL ACTION NO. 1:16-CR-0218-LMM, 2017 WL 219393, at *6 (N.D. Ga. Jan. 19, 2017); United States v. Williams, 113 F.R.D. 177, 179

(M.D. Fla. 1986) (footnote and citation omitted) (explaining that when the "[i]nformation about events in which one or more of the defendants participated, or which occurred in one or more of the defendants' presence" was sought, the "Eleventh Circuit has held that this sort of information need not be furnished in a bill of particulars").[8]

In sum, Shackelford and Kirkman's requests "have very little to do with an actual need for a bill of particulars predicated upon legitimate deficiencies in the clarity of the charging instrument," United States v. Langford, CR-08-CO-245-S, 2009 WL 10671369, at *15 (N.D. Ala. July 2, 2009), adopted by 2009 WL 10671793, at *4 (N.D. Ala. July 28, 2009), and the indictment provides "sufficient information about the nature of the charges to enable [Shackelford and Kirkman] to prepare for trial, to avoid unfair surprise, and to enable [them] to plead double jeopardy in the event of a later prosecution for the same offense," Bickers, 2019 WL 7559292,

---

[8] Furthermore, while Kirkman seeks information related to "known co-conspirators" and "persons known," [Doc. 63 at 4], Shackelford filed a motion for the disclosure of the names of the unindicted co-conspirators and those who aided and abetted the crimes alleged in the indictment, [Doc. 61], which was adopted by Kirkman, [Doc. 66], and the Court subsequently granted the motion, see [Doc. 78]. And, it is undisputed that defense counsel is aware of the identities of Individual-1 and Individual-2, both of whom testified at the evidentiary hearing held on April 14, 2023, see [Doc. 128]. Thus, Kirkman has failed to show that the information sought in this respect has not already been provided or made available to him by other sources. See Roberts, 174 F. App'x at 477.

at *8 (citations omitted).   Shackelford and Kirkman are "not entitled to information, beyond the detailed [i]ndictment and [] discovery produced by the government, describing the specific role [they are alleged to have] played [] in the conspiracy or the particular acts [they are] alleged to have participated in, had knowledge of, or for which [they are] being held responsible."   United States v. Sterritt, 21-CR-193 (KAM), 2023 WL 4140269, at *4 (E.D.N.Y. June 22, 2023) (citation and internal marks omitted).   In short, Shackelford and Kirkman "bear[] the burden of showing that the information requested is necessary and that [they] will be prejudiced without it so as to justify granting a bill of particulars," Jackson, 2019 WL 7842416, at *3 (citations and internal marks omitted), and they have failed to meet their burden with respect to the particulars sought by their motions. Accordingly, Shackelford's motion for a bill of particulars, [Doc. 57], as adopted by Kirkman, [Doc. 63], is **DENIED**.

**B.** __Motions to Dismiss, [Docs. 58 & 59]__

Shackelford has moved to dismiss Count Two of the indictment, [Doc. 58], asserting that it "is guilty of duplicity," since "[i]t contends that all three named [d]efendants conspired to violate the two opposite sides of 18 U.S.C. [§] 1791, which criminalizes the providing (§[]1791(a)(1)) or receipt (§[]1791(a)(2)) of 'prohibited objects' by a federal inmate" and therefore "charges two or more separate and distinct offenses," [id. at 2 (citation and internal marks omitted)].

21

Kirkman moves to adopt Shackleford's motion, [Doc. 64], asserting that his "motion differs slightly factually" based on the counts that he is charged in, but that his "claims are subject to the same legal analysis and arguments as set forth in [] Shackleford's [m]otion," and that because Count Two "charges two or more separate and distinct offenses," it should be dismissed for duplicity, [id. at 1, 3]. Shackleford also moves to dismiss Counts Four through Six of the indictment as multiplicitous, [Doc. 59], arguing that the government "has charged a single crime in three separate counts, thus improperly expanding the number of charges in this case," [id. at 1]. Kirkman also has moved to adopt this motion, [Doc. 65], again asserting that while his "motion differs slightly factually" because of the counts in which he is charged, his "claims [] are subject to the same legal analysis" and therefore, he moves to dismiss Counts Seven and Eight rather than Counts Four through Six, [id. at 1]. In response, the government maintains that the indictment is neither duplicitous nor multiplicitous. [Docs. 82 & 83]. For the reasons that follow, the Court agrees with the government.

### 1.   *Duplicity*

Shackleford and Kirkman argue that Count Two of the indictment must be dismissed because it is duplicitous. See [Docs. 58 & 64]. They assert that because Count Two charges all defendants with both providing prohibited objects under § 1791(a)(1) and receipt of prohibited objects under §1791(a)(2), it "charges two or

more separate and distinct offenses."  [Doc. 64 at 3]; see also [Doc. 58 at 2].  The government responds that "Count Two alleges that [defendants] . . . and others conspired to violate 18 U.S.C. § 1791(a)(1) and 18 U.S.C. § 1791(a)(2), all in violation of 18 U.S.C. § 371," and that it therefore "alleges a single conspiracy with two separate objects," which "is not duplicitous."  [Doc. 82 at 4 (citations omitted)].

"A duplicitous indictment charges two or more separate and distinct crimes in a single count."  United States v. Burton, 871 F.2d 1566, 1573 (11th Cir. 1989) (per curiam) (citation omitted).  "Duplicity, if uncorrected, can lead to the conviction of a defendant without unanimity among jurors respecting what offense has been committed, to prejudice against a defendant in a later double jeopardy defense, and to confusion respecting the admissibility of evidence."  United States v. Campbell, No. 1:04–CR–0424–RWS, 2005 WL 6436621, at *7 (N.D. Ga. Oct. 24, 2005) (citation omitted).  However, duplicity is not usually fatal to an indictment, see United States v. Robinson, 651 F.2d 1188, 1194 (6th Cir. 1981), and other courts have noted "that the rules regarding duplicity are pleading rules and, as such, the defendant's remedy is to move to require the prosecution to elect the charge within the count and that a duplicitous indictment is remediable by a jury instruction particularizing the offense charged in each count," United States v. James, 749 F. Supp. 2d 705, 711 (S.D. Ohio 2010) (citation omitted), aff'd, 496 F. App'x 541 (6th Cir. 2012) (unpublished).  That is, generally, any confusion or risk

of non-unanimity can be appropriately addressed and eliminated by special interrogatories and careful jury instructions.  See United States v. Deason, 965 F.3d 1252, 1269 (11th Cir. 2020); United States v. Davis, 306 F.3d 398, 416 (6th Cir. 2002); United States v. Marshall, 75 F.3d 1097, 1111-12 (7th Cir. 1996); United States v. Pungitore, 910 F.2d 1084, 1136 (3d Cir. 1990).

Count Two of the indictment charges conspiracy in violation of 18 U.S.C. § 371, alleging in relevant part:

> 18.  Beginning by at least June 2018 and continuing through at least February 2019, the exact dates unknown, in the Northern District of Georgia, defendants [] Shackelford, [] Kirkman, [] Arms . . ., Individual-1, and Individual-2, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with each other and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:
>
> > a.  in violation of a statute and a rule and order issued under a statute, to provide to inmates of USP Atlanta prohibited objects, namely methamphetamine and marijuana, and attempt to do so; in violation of [18 U.S.C. §] 1791(a)(1); and
> >
> > b.  to permit inmates of USP Atlanta to possess, obtain, and attempt to obtain prohibited objects, namely methamphetamine and marijuana, in violation of [18 U.S.C. §] 1792(a)(2).

[Doc. 1 ¶ 18 (emphasis and all caps omitted)].

Contrary to Shackelford and Kirkman's contentions, Count Two is not duplicitous.  Rather, as the government asserts, Count Two charges only one conspiracy offense, see [Doc. 82 at 4-5]; see also [Doc. 1 ¶ 18], and a "conspiracy count is not duplicitous simply because more than one object is identified with

24

multiple means of establishing the objects of the conspiracy." <u>United States v. Slawson</u>, Criminal Case No. 1:14–CR–00186–RWS–JFK, 2014 WL 5804191, at *9 (N.D. Ga. Nov. 7, 2014), adopted by 2014 WL 6990307, at *1 (N.D. Ga. Dec. 10, 2014).  That is, "[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for [t]he conspiracy is the crime, and that is one, however diverse its objects." <u>Braverman v. United States</u>, 317 U.S. 49, 54 (1942) (citations and internal marks omitted); <u>see also</u> <u>United States v. Berger</u>, 22 F. Supp. 2d 145, 150–51 (S.D.N.Y. 1998) (citations and internal marks omitted) (explaining that a conspiracy charge "presents unique issues in duplicity analysis because a single agreement may encompass multiple illegal objects" and that "[a]s a result, an indictment is not duplicitous merely because it alleges a conspiracy to commit multiple crimes").

"A conspiracy is not the commission of the crime which it contemplates, and neither violates nor arises under the statute whose violation is its object." <u>Braverman</u>, 317 U.S. at 54 (citations and internal marks omitted).  In other words, "[w]ith a conspiracy count, it is the conspiracy that matters and not what the defendants conspired to do," and quite simply, "[t]he indictment can allege multiple objects of the conspiracy, and even if the jurors disagree as to what the object of the conspiracy was, they can unanimously agree that the defendants

conspired to commit some crime." <u>United States v. Holland</u>, 396 F. Supp. 3d 1210, 1233 (N.D. Ga. 2019) (citation omitted).

Here, "[t]he offense of conviction is conspiracy to commit an offense against the United States, a violation of 18 U.S.C. § 371, with the underlying offense [being] . . . in violation of 18 U.S.C. § 1791," and "[t]o convict defendants under this count, the [government ] is required to prove that an agreement to provide a prohibited object in prison was reached, that each defendant voluntarily and intentionally joined in the agreement, that each defendant knew the purpose of the agreement, and that one of the co-conspirators did one or more overt acts in furtherance of the conspiracy." <u>United States v. Fowler</u>, Case No. 4:19-cr-00174 KGB, 2021 WL 3725812, at *1 (E.D. Ark. Aug. 23, 2021) (citation omitted). Therefore, even if the two subsections of § 1791 constitute separate offenses, as Shackelford and Kirkman contend, Count Two is not duplicitous. <u>See</u> <u>United States v. Mathis</u>, 239 F. App'x 513, 516 (11th Cir. 2007) (per curiam) (unpublished) (citation omitted) (finding conspiracy count was not duplicitous based on the government having charged violations of two subsections under 18 U.S.C. § 1956, since "a conspiracy may have two objectives" and the "conspiracy count simply charged two objectives for the conspiracy, not duplicitous offenses"); <u>United States v. Harris</u>, Criminal Case No. 1:09–CR–0406–TCB–JFK, 2010 WL 4962981, at *2 (N.D. Ga. Oct. 22, 2010) (citation and internal marks omitted) (finding conspiracy count was not duplicitous, since

26

"even if the two subsections of § 1348 constitute separate offenses as argued by [d]efendants," the "single conspiracy [was] the crime, not its diverse objects"), adopted by 2010 WL 4967821, at *5 (N.D. Ga. Dec. 1, 2010).  Thus, Shackelford and Kirkman are not facing the risks of a conviction without unanimity among jurors respecting what offense has been committed or prejudice in a later double jeopardy defense that arise from a duplicitous indictment.  See United States v. Holland, CRIMINAL ACTION NO. 1:17-CR-00234-AT-CMS, 2018 WL 8838863, at *3 (N.D. Ga. Sept. 6, 2018) (citation omitted) (explaining that "a count alleging a conspiracy to commit several crimes [was] not duplicitous," but was "a multi-object conspiracy" and that it was "the single agreement that [was] the crime, and only the single penalty prescribed by the statute [could] be imposed"), adopted by 396 F. Supp. 3d at 1249.  Moreover, any concerns about confusion respecting the admissibility of evidence can be adequately addressed with an appropriate jury charge and verdict form.  See United States v. Rives, CRIMINAL CASE NO. 1:14-CR-00130-TWT-JFK-4, 2015 WL 7574759, at *18 (N.D. Ga. Sept. 15, 2015) (citations and internal marks omitted) (explaining that even if the conspiracy count "was determined to be duplicitous, the remedy [was] not dismissal of that count of the indictment," but rather, "[a]ny danger flowing from the duplicity of charging more than one crime in a single count [could] be cured by a jury instruction explaining unanimous agreement must be reached that the government proved,

beyond a reasonable doubt, a single conspiracy"), adopted by 2015 WL 7575933, at *1 (N.D. Ga. Nov. 25, 2015).   Accordingly, Shackelford and Kirkman's arguments that Count Two should be dismissed as duplicitous are without merit, and the motion to dismiss, [Doc. 58], as adopted, [Doc. 64], is due to be denied.

### 2. *Multiplicitous*

Shackelford also moves to dismiss Counts Four through Six, [Doc. 59], asserting that "[t]hese charges violate the rule prohibiting multiplicity," since they are "mirror-image providing 'prohibited objects' crimes in violation of §[]1791(a)(1[)]," with the "only difference among the[] three charges [being] the 'prohibited object,'" as the "prohibited object in Count Four is methamphetamine, in Count Five it is marijuana, and in Count Six it is 'cellular phones,'" [id. at 1-2]. He therefore maintains that because the indictment "charges a single offense in more than one count," this "is multiplicity, plain and simple." [Id. at 2-3 (citations omitted)].  Kirkman moves to adopt Shackelford's motion, [Doc. 65], arguing that while his "motion differs slightly factually" because he is not charged in Counts Four through Six, but is charged in Counts Seven and Eight, which are "mirror image counts[, ] alleg[ing] the possessing, obtaining, and attempting to obtain 'prohibited object' crimes in violation of [§ 1791(a)(2)]," with the "prohibited object in Count Seven [being] methamphetamine, and in Count Eight [it] is marijuana," his "claims [] are subject to the same legal analysis," and he therefore moves to

dismiss Counts Seven and Eight of the indictment as multiplicitous, [id. at 1-2]. The government responds that "Counts Four through Six, which charge three separate violations of 18 U.S.C. § 1791(a)(1), are plainly not multiplicitous," since "each requires 'proof of a fact' that the other does not," and similarly, Counts Seven and Eight should not be dismissed for multiplicity for the same reasons. [Doc. 83 at 4-6].  For the following reasons, the Court agrees.

"An indictment is multiplicitous if it charges a single offense in more than one count."  United States v. Williams, 527 F.3d 1235, 1241 (11th Cir. 2008) (citations omitted).  "A multiplicitous indictment not only subjects the defendant[s] to numerous sentences for one offense, but also prejudice[s] the defendant[s] and confuse[s] the jury by suggesting that not one but several crimes have been committed."  Id. (second and fourth alterations in original) (footnote, citation, and internal marks omitted).  Therefore, "[a] multiplicitous indictment [] violates the principles of double jeopardy because it gives the jury numerous opportunities to convict the defendant[s] for the same offense."  Id.  "Because a multiplicitous indictment involves double jeopardy issues, multiplicity and double jeopardy challenges are typically evaluated under the same standards."  United States v. Woods, 730 F. Supp. 2d 1354, 1376 (S.D. Ga. 2010), aff'd, 684 F.3d 1045 (11th Cir. 2012) (per curiam).  "Accordingly, the test enunciated in [Blockburger v. United States, 284 U.S. 299 (1932),] used to evaluate double

jeopardy challenges . . . is also used to determine whether an indictment is multiplicitous, verifying that each count requires an element of proof that the other counts do not require." Id. (citation and internal marks omitted).

"Under *Blockburger*[,] the test to be applied to determine whether two statutory provisions prohibiting the same conduct violate the Double Jeopardy Clause, or whether each count of the indictment may result in a conviction for the same offense, is whether each provision [or count] requires proof of a fact which the other does not." Id. (last alteration in original) (citation and internal marks omitted). Pursuant to this test, "the focus is on the proof necessary to establish the statutory elements of the offense, not the actual evidence presented at trial." Id. (citation omitted). However, "multiplicity in an indictment does not require the entire indictment to be dismissed; instead, the appropriate remedy for multiplicity calls for consolidating a multiplicitous charge into one count, or issuing special instructions to the jury." United States v. Bobo, No. CRA 1:06CR0172-02 TW, 2007 WL 962978, at *4 (N.D. Ga. Feb. 20, 2007) (citation omitted), adopted by 2007 WL 9676896, at *1 (N.D. Ga. Mar. 23, 2007).

Shackelford asserts that Counts Four through Six, charging him with providing prohibited objects, with the prohibited object being methamphetamine in Count Four, marijuana in Count Five, and cellular phones in Count Six, all in violation of 18 U.S.C. § 1791(a)(1), are multiplicitous because the government "has

charged a single crime in three separate counts, thus improperly expanding the number of charges in this case." [Doc. 59 at 1-2]; see also [Doc. 1 ¶¶ 23-28]. Kirkman similarly asserts that Counts Seven and Eight, charging him and Arms with possessing, obtaining, and attempting to obtain prohibited objects, with the prohibited object in Count Seven being methamphetamine and in Count Eight being marijuana, both in violation of 18 U.S.C. § 1791(a)(2), are multiplicitous because "[t]he only difference between the two charges is the 'prohibited object[.]'" [Doc. 65 at 1-2]; see also [Doc. 1 ¶¶ 29-32].

"To convict a defendant pursuant to § 1791(a)(1), the [g]overnment must prove beyond a reasonable down that []he (1) knowingly provided or attempted to provide, (2) a prohibited object, (3) to an inmate detained in a federal prison or correctional institution." United States v. Deramus, CRIMINAL ACTION NO. 1:20-CR-220-SDG-RDC-2, 2021 WL 1725528, at *2 (N.D. Ga. Mar. 31, 2021) (citation omitted), adopted by 2021 WL 1720894, at *1 (N.D. Ga. Apr. 30, 2021). "In order to convict a defendant under § 1791(a)(2), the [g]overnment must prove beyond a reasonable doubt that the defendant was (1) an inmate in a federal prison or correctional facility, (2) that []he knowingly made, possessed or acquired, (3) a forbidden object." Id. (citation omitted). Contrary to Shackelford and Kirkman's assertions, "the specific language in the statute suggests that there can be multiple convictions for possession of different prohibited objects at the same time." United

States v. Santos-Gomez, Criminal Action No. 1:11–CR–0516–RWS, 2012 WL 1939726, at *2 (N.D. Ga. May 29, 2012).  Indeed, the statute prohibits the providing of and "the possession of 'a prohibited object,'" and the "language is similar to that used in statutes describing drug offenses that prohibit conduct with regard to 'a controlled substance[]'" where "[i]n those instances, multiple convictions can result from the prohibited conduct relative to multiple drugs."  Id.; see also United States v. Vargas-Castillo, 329 F.3d 715, 719 (9th Cir. 2003) (rejecting argument that separate charges for possession of marijuana and possession of cocaine were multiplicitous because defendant was "being charged twice for the same offenses, namely importation and possession of 'controlled substances' with intent to distribute," since to convict defendant, the government had to prove in one count that marijuana was possessed and in the other count that cocaine was possessed therefore necessitating different proof requirements).  Therefore, the charges contained in Counts Four through Six against Shackelford and Counts Seven and Eight against Kirkman and Arms are not multiplicitous, see Santos-Gomez, 2012 WL 1939726, at *1-2 (finding two separate counts charging defendant with possession of marijuana as an inmate and possession of a weapon as an inmate, both in violation of 18 U.S.C. § 1791(a)(2), were not multiplicitous), and Shackelford's motion to dismiss multiplicitous counts, [Doc. 59], as adopted by

Kirkman, [Doc. 65], is due to be denied.[9]   Accordingly, it is **RECOMMENDED**

that the motions to dismiss, [Docs. 58 & 59], be **DENIED**.

## C.   Motion to Suppress Out of Court Photographic Evidence, [Doc. 72]

Arms moves to suppress out of court photographic evidence, [Doc. 72],

which Kirkman has adopted, [Doc. 75].  In particular, Arms contends that any

identifications of him made by Individual-1, including the photo array shown to

Individual-1 on August 26, 2020, was "tainted" because Individual-1 was shown

a photograph of Arms at an earlier interview conducted by Department of Justice

("DOJ") BOP Special Investigative Services ("SIS") Lieutenant Ulysses Burgess

and DOJ BOP SIS Agent Gerson Rivera, but there is no record of the circumstances

---

[9] While the challenged counts are not multiplicitous for the reasons discussed, even if "[a]n indictment . . . charging the same offense in more than one count is multiplicitous," it is "not fatal[.]"  United States v. Siegelman, 2:05 CR 119 MEF, 2006 WL 752951, at *3 (M.D. Ala. Mar. 22, 2006) (alterations in original) (footnote, citation, and internal marks omitted).  Indeed, "there are . . . remedies available to alleviate potential prejudice," including "by offering appropriate instructions to the jury."  Id. (citation omitted); see also United States v. Pefanis, Criminal Action No. 1:10–CR–0513–RWS–CCH, 2011 WL 1134310, at *3 (N.D. Ga. Mar. 1, 2011) (citation omitted), adopted by 2011 WL 1113954, at *1 (N.D. Ga. Mar. 25, 2011).  In fact, "should the evidence at trial demonstrate that the charges were improperly multiplied, the trial court can still remedy any violation by consolidating the counts or requiring dismissal," and, "even after a verdict, any error may be remedied by vacating multiplicitous convictions and any concurrent convictions based upon those convictions."  United States v. Ford, Criminal Action No. 1:12–CR–297–TWT–ECS–1, 2013 WL 1337130, at *2 n.3 (N.D. Ga. Mar. 5, 2013) (citations omitted), adopted by 2013 WL 1320739, at *1 (N.D. Ga. Mar. 29, 2013), aff'd, 784 F.3d 1386 (11th Cir. 2015); see also Bobo, 2007 WL 962978, at *4.

under which any photograph was shown, including what Individual-1 said prior to the presentation of a photograph, what the SIS officers said to Individual-1 prior to the presentation of a photograph, or even which photograph or photographs were shown to Individual-1. [Doc. 140 at 2-4; Doc. 146 at 1]. He also contends that the photo array shown to Individual-1 during an interview with DOJ Office of Inspector General ("OIG") Special Agent Eric Fehlman ("Agent Fehlman"), Federal Bureau of Investigation ("FBI") Special Agent Bridget Brock ("Agent Brock"), and Drug Enforcement Administration ("DEA") Special Agent Jay Rajaee ("Agent Rajaee") on August 26, 2020, "is a textbook definition of a suggestive photo array" and that Individual-1 "is generally unreliable" and the "Court should reject the [g]overnment's suggestion that the Court attribute credibility to [Individual-1]." [Doc. 140 at 3, 6-8; Doc. 146 at 5]; see also [Doc. 124-3]. Kirkman likewise contends that the photographic identifications made by Individual-1 on May 20, 2019, and August 26, 2020, and by Individual-2 on July 20, 2021, should be suppressed because the identifications by Individual-1 were tainted by the earlier interview of Individual-1 by SIS officers during which a photograph of Kirkman appears to have been shown and because neither Individual-1 nor Individual-2 "could reliably identify Kirkman when they were interviewed." [Doc. 147 at 2-5, 7, 18 (emphasis omitted)]; see also [Docs. 137, 124-1, 124-3, & 124-5]. Based on these arguments, both Arms and Kirkman request "the Court to bar

future in-court identifications because they are irredeemably tainted by the previous unreliable identifications."  [Doc. 137 at 1 (citation omitted)]; see also [Doc. 140].

In response, the government argues that the motion to suppress filed by Arms and adopted by Kirkman should be denied because the identifications of Kirkman by Individual-1 on May 20, 2019, and August 26, 2020, and Individual-2 on July 20, 2021, as well as the identification of Arms by Individual-1 on August 26, 2020, are admissible as sufficiently reliable, "regardless of whether the out-of court identification procedure[s were] unduly suggestive[.]"  [Doc. 145 at 2-3, 5, 7-28].  The government also argues that even if an in-court identification was preceded by a suggestive out of court identification, the in-court identification is nonetheless admissible if based on an independent source and therefore, "at trial[,] . . . the government may still elicit testimony to establish a basis that each of them could identify Kirkman and/or Arms."  [Id. at 28 n.21 (citation omitted)].  Arms and Kirkman have filed replies in support of the motion to suppress out of court photographic evidence, see [Docs. 146 & 147], and the Court will address the parties' arguments in turn.

1.    *Statement of Facts*

    a.    **May 20, 2019, Interview of Individual-1**

On May 20, 2019, DOJ OIG Agent Fehlman, along with FBI Agent Brock and DEA Agent Rajaee, interviewed Individual-1 at the Federal Correctional Institution in Edgefield, South Carolina ("FCI-Edgefield"), as part of "an official OIG criminal investigation regarding allegations that USP Atlanta Plumbing Supervisor [] Shackelford provided contraband to inmates at USP Atlanta in exchange for money." See [Doc. 124-1]; (Gov. Ex. 1).[10]  After advising Individual-1 of his Miranda[11] rights and placing him under oath, the agents proceeded to interview Individual-1, who consented to be interviewed.  [Doc. 124-1 at 4-6]. Individual-1 described how he learned that drugs were being brought in and sold to inmates at USP Atlanta through another inmate who later became his cellmate, [id. at 7-11, 38-39], and when asked to identify other inmates who were helping his cellmate, Individual-1 described an inmate who he knew as "Pat," as a "[b]lack guy" from Alabama, around the same age as him, which was 40, about 5 feet and 10 inches tall, and who weighed 230 to 240 pounds, [id. at 11-12].  Individual-1

---

[10] This interview was audio recorded and subsequently transcribed.  See (Gov. Ex. 1); [Doc. 124-1].

[11] See Miranda v Arizona, 384 U.S. 436 (1966).

explained that "Pat" helped by selling contraband within the compound, [id. at 13], and then the following exchange occurred:

> [Agent] Rajaee:    It's up to you guys if want me to show him this or not.
>
> [Agent] Brock:    You can show him.  Yeah.
>
> [Agent] Rajaee:    Okay.  Is – who is that?
>
> [Individual-1]:    Pat.
>
> [Agent] Brock:    And just for the record, [Individual-1] identified Patrick Kirkman . . . an inmate at USP Atlanta.

[Id. (all caps omitted)].

Agent Rajaee asked Individual-1 how he knew Pat was a distributor, and Individual-1 explained that he had "seen him pass stuff off."  [Id.].  Individual-1 also stated that an inmate he knew as "Envelope," later identified as Arms, also distributed contraband and "got stuff in" such as "[w]eed," "tobacco," and methamphetamine, and he described him as a "[b]lack guy" with "long dreads" from Chattanooga, about 30 years old, a little shorter than his height at 5 feet 10 inches, and weighing about 200 pounds.  [Id. at 14-16, 30].  Individual-1 explained that his knowledge of this information was because either "Envelope" or "Pat" would let him know when contraband was in the visitor's bathroom and he would then go to visitation and pick up the contraband and bring it to "Envelope."  [Id. at 16, 108, 174].  Individual-1 then identified another inmate known as

37

"Schoolboy," who was purportedly part of the scheme, [id. at 16-17], and he then made a statement about his SIS interview and that "[t]hey had all their pictures in there," [id. at 18-19]; see also [id. at 30].  Individual-1 also described an individual "with a fake leg" who was bringing the contraband to the BOP as being associated with "Schoolboy and Pat" and that he knew this because "Pat" had told him and that "Pat" would also tell him the amount of contraband that was supposed to be coming in.  [Id. at 19-23, 27-28, 34-35, 128-29, 170].  Individual-1 further identified his "boss" as "Shack," whom he also identified by the full name of "Patrick Shackelford," and discussed Shackelford's role in the scheme, as well as his own relationship with Individual-2.  [Id. at 24-25, 36, 71-79, 83-88, 94-107, 109, 111-13, 125-26, 157, 160-61, 169-70, 172-73, 176].  Individual-1 also explained that he participated in the scheme for about six months, though he said they "were locked down probably about two months so [it was about] four months," and that he "only talked to [his cellmate], Pat or Envelope."  [Id. at 37-38, 111, 169].

During this interview, Individual-1 also explained that "Pat" used Cash App to send him money and that he introduced him to others that helped facilitate the smuggling scheme.  [Id. at 51-52, 94, 131-32].  He further explained that Cash App often had a picture of the individual associated with the account on it so he could see who was sending/receiving the money and that Kirkman's account had a picture of him associated with it.  [Id. at 132-40, 151].  He estimated that "Pat"

sent him approximately $30,000 via Cash App and that "Envelope's" girlfriend, whose account also had a picture associated with it, sent him about $10,000 to $15,000 via Cash App. [Id. at 139-41, 149-50]. The interview ended after about two hours and thirty minutes. [Id. at 3, 185].

### b.  August 26, 2020, Interview of Individual-1

On August 26, 2020, Agent Fehlman, along with FBI Special Agent Kim Spell-Fowler ("Agent Spell-Fowler"), conducted a second interview of Individual-1 at FCI-Edgefield. [Doc. 124-3]; (Gov. Ex. 4).[12] Agent Fehlman advised Individual-1 of his Miranda rights, which he agreed to waive, and placed him under oath. [Doc. 124-3 at 4-6. Individual-1 again explained that his supervisor at USP Atlanta was "Shackelford," and Agent Fehlman summarized that at the last interview, they had discussed "Envelope," "Schoolboy," and "Pat," among others. [Id. at 9, 12, 14-15, 67]. Agent Fehlman showed Individual-1 "some pictures" with regard to the hole in the wall he and Individual-2 created in the visitor's bathroom, and they again discussed various aspects of the smuggling scheme, including that he told "Pat" that Shackelford wanted Percocet and cash and "Pat" arranged to have both brought into USP Atlanta. [Id. at 16-21, 24-28, 31-33, 36-39, 41-45, 48, 57-61, 64-65, 70-72, 76-77].

---

[12] This interview was also audio recorded and subsequently transcribed. (Gov. Ex. 4); [Doc. 124-3].

During this interview, Agent Fehlman, who had prepared three photographic lineups that included photographs of Arms and Kirkman, see [Doc. 124-4], advised Individual-1 that "if we showed you a line up,. . . . [i]f we say is Envelope in this lineup, I'm not asking you to identify anybody else," and "it doesn't mean they're in there," but it "just means we're going to show you some lineups," [Doc. 124-3 at 67-68]. Agent Fehlman further advised Individual-1 that even though he had identified "Pat" at the last interview, "it's so far removed from the last time [he] saw Pat, [he] just want[ed] to make sure [he] remember[ed] who [they were] talking about." [Id. at 68]. The following exchange then occurred:

> [Agent] Fehlman:  So, we're going to show you some photo lineups real quick.  And like I said, if you're not sure, just don't guess.  That's all I ask.  Don't guess.
>
> [Individual-1]:     I understand.
>
> [Agent] Fehlman:  Just if you're not sure, you're not sure.
>
> [Individual-1]:     Okay.
>
> [Agent] Fehlman:  Go ahead, [Agent Spell-Fowler].  I'll let you do that if you want to.
>
> [Agent] Spell-Fowler:     I have a question. . . . When we're talking about like Schoolboy and. . . . Envelope. . . . Do you know their real names?
>
> [Individual-1]:     No. . . .I just know everyone calls one Envelope and the other one is Schoolboy the whole time I've been there.
>
> [Agent] Spell-Fowler:     Okay.  And then Kirkman, you knew him by his name, right?

[Individual-1]:      Yeah. . . . Just everybody called him Pat.

[Id. at 68-69 (all caps omitted)].

After further discussion about the smuggling of contraband, [id. at 70-77], Agent Fehlman brought the discussion back to the photo lineups, at which time Agent Spell-Fowler advised Individual-1 that there were three arrays and asked him to read and sign the "Acknowledgment of Understanding" form with respect to each one, which advised in relevant part:

> I, [Individual-1], understand that in a moment I am going to view a group of photographs. This group of photographs may or may not contain a picture of the person being investigated. I will keep in mind that hair styles, beards, and moustaches may be easily changed. Also, photographs may not always depict the true complexion of a person – it may be lighter or darker than shown in the photo. I will pay no attention to any marking or numbers that may appear on the photos or any other differences in the type of style of the photographs. When I have looked at all the photos, I will tell the agent whether I see any person known to me. I will NOT tell other witnesses that I have or have not identified anyone.

[Doc. 124-4 (emphasis omitted)]; see also [Doc. 124-3 at 78]. After reading the form, Individual-1 consented to participate and signed the forms. [Doc. 124-3 at 78; Doc. 124-4].

Individual-1 was then shown the first photo array, and he immediately identified "Pat" in Photo #3. [Doc. 124-3 at 79; Doc. 124-4 at 7]. Agent Fehlman clarified that "Photo 3 is the guy that you know as Patrick," and Individual-1 responded, "Yes," and said that it was "Patrick Kirkman," and indicated that he

was "[o]ne hundred percent positive." [Doc. 124-3 at 79]. Agent Spell-Fowler then showed Individual-1 the second photo array, at which time Individual-1 immediately identified "Schoolboy" as Photo #2. [Doc. 124-3 at 80; Doc. 124-4 at 5]. He also identified Kirkman again from this photo array as Photo #4. [Doc. 124-3 at 81; Doc. 124-4 at 5]. Agent Spell-Fowler then showed Individual-1 the third photo array, and he immediately identified Photo #1 as "Envelope" and indicated that he was "[o]ne hundred percent[]" positive that was him. [Doc. 124-3 at 81; Doc. 124-4 at 3]. Individual-1 further commented that it "was a bad picture of him, but it was still him" and again reiterated that while the picture was "a little out of focus[, ] it was still him." [Doc. 124-3 at 82]; <u>see also</u> [Doc. 124-4 at 3]. Agent Fehlman asked him how sure he was, and Individual-1 stated that he was "[o]ne hundred percent on all three[ o]f them." [Doc. 124-3 at 82]. Individual-1 also subsequently identified "Envelope's number" and one of Kirkman's phone numbers, and also explained that "Pat used [his] phone a couple of times when he didn't have a phone." [<u>Id.</u> at 83, 85-86, 123-25]. Individual-1 further described that "Envelope [was] supposed to be one of the head Crips" and "Pat [was] from Alabama" and was "head of the Alabama Boy[s] there," and he believed he made about $35,000 "off of Pat," with the rest of his money being from "Envelope," but he was "closer to Pat then [he was] to Envelope[.]" [<u>Id.</u> at 92, 95, 97].

Agent Spell-Fowler also showed Individual-1 a photo taken off of his phone and asked if he could identify who was depicted in the photo, but he could not identify the person in the picture, except to say that he saw a "cop," with what appeared to be a badge, and that it looked like Kirkman but that he could not "tell with the glasses." [Id. at 112-13]; see also [Doc. 122-5]. He then stated, "I mean, I really can't tell, [i]t does and it don't" and that it was not a picture he recognized. [Doc. 124-3 at 113-14]. Individual-1 also identified the "Cash App with [] Kirkman where he was sending money" or "trying to send money to [him]" for delivering the packages. [Id. at 128-29, 136, 138]. He also discussed how "Envelope [had tried] to get [him] to cut [Kirkman out" of the scheme. [Id. at 94-97, 131].

### c.   July 20, 2021, Interview of Individual-2

On July 20, 2021, DOJ OIG Special Agent Ben Gerrol ("Agent Gerrol"), along with Agent Spell-Fowler and Individual-2's defense counsel, interviewed Individual-2. See [Doc. 124-5]; (Gov. Ex. 7).[13] Individual-2 described that he worked under the supervision of Shackelford and another supervisor while on the plumbing crew, [Doc. 124-5 at 7-8], and that Shackelford "was always real lax about anything," [id. at 10]. He also described his relationship with Individual-1, [id. at 16-19], creating the hole in W ward with Individual-1 and their relationship

---

[13] This interview was also audio recorded and subsequently transcribed. (Gov. Ex. 7); [Doc. 124-5].

with Shackelford and the scheme, [id. at 19-54, 57-72, 76-105, 107, 111-16, 121, 123, 136-38, 141-48, 151-52, 154, 174-75], and that he was paid by Individual-1 through Cash App for helping create the hole in the wall and for retrieving and delivering contraband, [id. at 54-57, 110-11, 123, 179].

Individual-2 also discussed that Individual-1 introduced him to a "[b]lack dude" that lived in B2 by showing him to Individual-2 "on the yard one day."  [Id. at 125].  Agent Gerrol subsequently asked Individual-2 if he remembered the name Pat, to which he responded, "Yeah.  Pat, I do remember. . . . Pat was the one that [Individual-1] introduced [him] to."  [Id. at 127].  The following exchange then ensued:

> [Individual-2]:      He introduced me to Pat.  I do not know his last name. . . .
>
> [Agent] Gerrol:      He had short hair, lighter skin, from Alabama. . .
>
> [Individual-2]:      I think – truthfully, it's been a few years ago.  I don't remember exactly. . . . what he looked like.
>
> [Agent] Gerrol:      If it comes to it, we can get you a picture.
>
> [Individual-2]:      I remember the name Pat.
>
> [Agent] Gerrol:      Do you remember the name Pat?
>
> [Individual-2]:      I do remember the name Pat.
>
> [Agent] Gerrol:      Okay.
>
> [Individual-2]:      I remember that.

[Agent] Gerrol:      Okay.

[Individual-2]:      For sure.  And [Individual-1] also told me that if I
don't see Pat to give it to [another inmate].

[Id. at 128-29 (all caps omitted)]; see also [id. at 130].  Individual-2, however, did

not recall "the name 'Envelope[.]'"  [Id. at 178].

Individual-2 also detailed the delivery of contraband by explaining that he

and Individual-1 would drop the contraband off at either "Pat's cell" or the cell of

another inmate.  [Id. at 154-55].  Thereafter, the following exchange occurred:

[Agent] Gerrol:      Do you recognize him?.

[Individual-2]:      There's something on his face right there.

[Agent] Gerrol:      Oh.

[Individual-2]:      Yeah.  That might be Pat.

[Agent] Gerrol:      Okay.

[Individual-2]:      Okay.  I was starting to say, is that – I think it is
Pat.

[Id. at 182 (all caps omitted)].

### d.    April 14, 2023, Evidentiary Hearing

Agents Brock, Fehlman, and Gerrol, as well as Individual-1 and Individual-

2, testified at the evidentiary hearing held on April 14, 2023.  See [Doc. 128].  Agents

Brock and Fehlman testified that late 2018 to early 2019, an investigation began

"related to the introduction of contraband coming into [USP Atlanta.]"  (Tr. at 33-

34, 52, 81-82).  Agents Brock and Fehlman explained that Individual-1 was interviewed in May 2019 as part of the investigation and that they had both previously met with him in early 2019, but that no photographs were shown to him at that earlier interview and that Individual-1 also did not disclose the involvement of any USP Atlanta employees in the scheme at that earlier interview. (Tr. at 34-36, 47, 53, 84, 111-12).  Following that earlier interview in January 2019, the discovery of additional information that identified a USP Atlanta employee, Shackelford, whom Individual-1 referred to as "Shack," as being involved in the scheme, prompted the agents to interview Individual-1 in May 2019 as they "were trying to determine" the "extent of the scheme to include the players involved." (Tr. at 36-37, 49-50, 78, 84-85, 95, 110).  Agent Brock testified that as part of the investigation, she had received a photo of Kirkman, whom Individual-1 referred to as "Pat," from the BOP and that was the photo shown to Individual-1 during the May 2019 interview.  (Tr. at 40, 63-64, 78, 95; Gov. Ex. 3).  Agent Brock clarified that the identifying information included to the right of the photo was not shown to Individual-1 as "[o]nly the photo was shown" and that this was the only single photo of Kirkman shown to Individual-1.  (Tr. at 40-41, 66; Gov. Ex. 3).  She testified that Individual-1 did not express any hesitation when he identified Kirkman during the interview on May 20, 2019, nor did he express any confusion as to who

they were all talking about.  (Tr. at 41-42).[14]  Agents Brock and Fehlman also testified that at the time Individual-1 was interviewed in May 2019, Arms, who went by the nickname "Envelope," had not yet been identified, and that neither of them were involved in any interview with Individual-1 by SIS that may have occurred on February 21, 2019.  (Tr. at 42-43, 56, 66, 74, 96, 102-03, 114-16).[15]

Agent Fehlman also testified about another interview of Individual-1 that occurred in August 2020 after the agents had discovered additional information

---

[14] Individual-1 testified that he knew "Pat" because they "were in the unit together for three or four years," that he saw "him on a daily basis[,]" and that while he was shown a single photo of "Pat" during the May 2019 interview, it was not necessary for him to identify him.  (Tr. at 229-31, 235).  Individual-1 also testified that he would see "Pat" outside of delivering contraband to him.  (Tr. at 235).

[15] Individual-1 testified that he did not recall being shown any photos during the SIS interview in February 2019 but agreed based on the transcript of the May 2019 interview that he must have been shown some photos.  (Tr. at 233-34, 253, 255-56). Agent Gerrol testified that he observed photographs that were attached to the memorialization of the February 2019 interview, but they were "primarily of the seized contraband, photos of the plumbing shop, as well as photos of [] Shackelford."  (Tr. at 202-03); see also (Tr. at 209).  He testified that he also "went back to USP Atlanta" and asked if there was anything that was not included in the original predication file and "was told there [was] nothing."  (Tr. at 203).  Agent Brock also testified about an interview of Individual-2 that occurred on July 2, 2019.  (Tr. at 67-69); see also (Tr. at 172-73).  During that interview, Individual-2 explained that he worked as a plumber for the preceding three years, was "assigned to the A block," and his direct supervisor was Shackelford, but he then "asked for a lawyer."  (Tr. at 69-70, 173-76).

following the May 2019 interview of Individual-1.  (Tr. at 86-88).[16]  Agent Fehlman

testified that during the August 2020 interview, Individual-1 was shown a few

photo lineups, and he explained that since he did not have access to inmates at

USP Atlanta, he asked the BOP to send him pictures and he then "assemble[d]

them into the six-pack[.]"  (Tr. at 88-89, 91, 93, 99, 101, 127, 130-32; Gov. Ex. 6).[17]

Agent Fehlman testified that Individual-1 did not express any hesitation while

identifying certain individuals from the photo arrays and that he did not observe

any confusion on Individual-1's part as to who he was referring to.  (Tr. at 94-95).[18]

Individual-2 also testified at the evidentiary hearing under an immunity

agreement.  (Tr. at 141-95).[19]  Individual-2 explained that he was currently living

---

[16] Agent Gerrol testified that he became involved in the investigation around December 2020, after Agent Fehlman was promoted, and he also testified that the connection between "Envelope" and Arms came after the May 2019 interview.  (Tr. at 197, 199).

[17] Agent Fehlman testified that no single photographs of Kirkman or "Envelope" were shown during the August 26, 2020, interview of Individual-1.  (Tr. at 95-96).

[18] Individual-1 testified that he also delivered contraband to "Envelope" and that they were also together at USP Atlanta for three to four years.  (Tr. at 234-35).  He further testified that he saw "Envelope" "pretty much all the time."  (Tr. at 235-36).  Agent Fehlman testified that Individual-1 was interviewed a third time, but no photos of individuals were shown to him during that interview.  (Tr. at 97-98).

[19] Prior to Individual-2's testimony, Kirkman's counsel placed on the record the fact that it was their intention to shield Kirkman from Individual-2 "to ask [Individual-2] some questions that go towards whether he could identify [] Kirkman," but that it had been brought to their attention that Individual-2 was sitting in the hallway and that "the Marshals brought [] Kirkman and . . . Arms in

in Tennessee after serving time for a bank robbery and that he had "basically been in and out of prison since [he] was about 18." (Tr. at 142-45). He explained that while at USP Atlanta, he was assigned to the plumbing department and eventually got involved in the smuggling of contraband through Individual-1. (Tr. at 145-47, 164). He also explained that he and Individual-1 would retrieve the contraband from the visitor's bathroom and would transport it using the plumbing cart and hide it until they could take it to the unit, which was B-2 and also where Individual-1 and "Pat" resided. (Tr. at 148-50, 168-69). Individual-2 explained that "Pat [was] the guy that [Individual-1] set things up to start everything" and that he did not "personally know Pat," but he knew who he was, and that he had been introduced to him once "out on the yard." (Tr. at 150-51, 155-56, 179). He described that Individual-1 brought him over to "Pat" and introduced him and said, "So be sure that if anything ever happens to me that you get the stuff and give it to Pat." (Tr. at 151).

Individual-2 also described that he accompanied Individual-1 to "Pat's cell" at B-2 to drop off the contraband, and he would normally just stand in front of the door as a lookout while Individual-1 delivered the contraband to "Pat," who was

---

[Individual-2's] eyesight." (Tr. at 139). The government also placed on the record that if this "matter does proceed to trial," it "would not elicit testimony from [] or seek to elicit testimony from [Individual-2] that he would make a physical [] or in-court identification of [] Arms." (Tr. at 140-41).

in the cell, and that he would also observe Individual-1 and Pat talking "all the time," though Pat was not a friend of his but they "knew who each other were" and he "would [] have recognized him[.]"  (Tr. at 152-53, 155-56, 163, 169-70, 190-91).  Individual-2 then described "Pat" as a "[b]lack guy," 30 to 35 years old, "[s]tocky guy," and a "little bit shorter than [him]" at six feet tall.  (Tr. at 156).  He also described his hair as "shaved off or . . . bald or something[.]"  (Tr. at 156-57).  Individual-2 reiterated that it had "been five years," but that he "knew him when [he] saw him," even though he did not know his last name and only knew him at "Pat."  (Tr. at 157, 180-81).  He also recalled being shown a photograph of "Pat" during the July 2021 interview and testified that he was "[v]ery confident" and had no doubt in his mind when he identified him during that interview and that seeing the photo did not have any impact on what he told the agents.  (Tr. at 160-61, 186-88, 191-92).[20]  Finally, Individual-2 testified that he never met "a person by

---

[20] Individual-2 explained that he had seen his lawyer "two or three times, period" and that if you asked him "two years from now exactly what she look[ed] like, [he] couldn't tell you," though he "could give you a general idea," but "if [he] saw her, [he] would recognize her[.]"  (Tr. at 188).  He testified that although he did not initially recall "exactly what Pat looked like because it had been three years or more at that time," when he "saw a picture of him, [he] knew who Pat was, just as [he] would [his] lawyer if [he] saw her two years from now."  (Tr. at 191).  He further explained that he had seen "Pat more than two or three times," and that he "would see him practically every time that [he and Individual-1] took the contraband up to the units," as well as "other times just in the chow hall or in the commissary or out on the yard or something."  (Tr. at 188-90).  He said that he "would just see him here and there" and that he would be able to recognize him.

the name of Envelope" nor did he know "a person by the name of [] Arms[.]"  (Tr.

at 164).

### 2.   *Analysis*

Arms now moves to suppress the out of court photographic identification

made by Individual-1 on August 26, 2020, [Doc. 72], which Kirkman has adopted,

[Doc. 75].[21]   In his post-hearing brief, [Doc. 137], Kirkman argues that the

identification by Individual-1 during the May 20, 2019, interview was unduly

suggestive, since Individual-1 was presented with a single photograph of

Kirkman, and that his identification was otherwise unreliable, [id. at 22-36].

Kirkman also argues that the identification by Individual-2 on July 20, 2021, was

unduly suggestive, since he too was presented with a single photograph of

Kirkman, and that his identification was also unreliable.  [Id. at 2-22].  Similarly,

---

(Tr. at 189).  Individual-1 also confirmed that Individual-2 sometimes went into
the cell with him to deliver the contraband.  (Tr. at 236).  Agent Gerrol also testified
about the July 20, 2021, interview of Individual-2 and explained that when he
pulled up the photo "Pat" on his laptop, the reference by Individual-2 to
something on his face was that he accidentally "hit the mouse pad or whatever
and it pulled a window over to cover up the picture."  (Tr. at 204, 218-19).  He also
testified that Individual-2 did not express any confusion when he made statements
regarding "Pat."  (Tr. at 205).  He further testified that there was no six-pack shown
to Individual-2 during that interview.  (Tr. at 219).

[21] The government opposed the motion, [Doc. 85], and Kirkman and Arms filed
replies in support of the motion, [Docs. 91 & 92].   Following the evidentiary
hearing on April 14, 2023, [Doc. 128], the parties filed post-hearing briefs, [Docs.
137, 140, 145, 146, & 147].

Arms contends that any identification by Individual-1 was tainted by the February 2019 SIS interview during which it appeared that Individual-1 was shown a photo of Arms but about which we have no record as to the presentation of the photograph or even which photographs were shown.  [Doc. 140 at 2-5].  He also contends that the procedure surrounding the photographic array presented to Individual-1 on August 26, 2020,[22] in which he was identified, was unduly suggestive.  [Id. at 3, 6-8].  Kirkman and Arms also seek to suppress any future identifications that are tainted by the earlier photographic identifications.  [Doc. 137 at 37; Doc. 140 at 8].

The government responds that the photo identifications should not be suppressed because even assuming that the procedures surrounding the presentation of the single photographs of Kirkman to Individual-1 and Individual-2 and the photo arrays to Individual-1 in which both Kirkman and Arms were identified were unduly suggestive, both Individual-1 and Individual-2's identifications were nonetheless reliable.  See generally [Doc. 145].  Arms and Kirkman filed replies in support of the suppression motion, [Docs. 146 & 147], and the Court will address the parties' arguments.

_____

[22] Arms refers to a photo array presented to Individual-1 in May 2019, but it is undisputed that the photo arrays were presented to Individual-1 during the August 26, 2020, interview.  See [Docs. 124-1 & 124-3].

"In the Eleventh Circuit, a two step analysis is used to determine whether the admission of an out-of-court identification violates due process." United States v. Perkins, Criminal Case No. 1:10–CR–97–JEC–LTW, 2011 WL 2294163, at *6 (N.D. Ga. Apr. 21, 2011) (citing United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001)), adopted by 2011 WL 2268055, at *1 (N.D. Ga. June 8, 2011), aff'd, 787 F.3d 1329 (11th Cir. 2015); see also Perry v. New Hampshire, 132 S. Ct. 716, 720, 722 (2012); United States v. Knight, 382 F. App'x 905, 907 (11th Cir. 2010) (per curiam) (unpublished). "First, a court must determine if the original identification procedures were unduly suggestive." Perkins, 2011 WL 2294163, at *6 (citation omitted). "Only if the answer to that question is yes, does the court continue the inquiry into whether, under the totality of the circumstances, the identification was nonetheless reliable[.]" United States v. Maxime, No. 09-20470 CR MARTINEZ, 2010 WL 2635097, at *1 (S.D. Fla. June 9, 2010) (citation and internal marks omitted), adopted by 2010 WL 2635099, at *1 (S.D. Fla. June 30, 2010).

"'[R]eliability is the linchpin in determining the admissibility of identification testimony.'" United States v. Celis-Sosa, Criminal Action File No. 4:10–CR–43–RLV–WEJ, 2011 WL 2149345, at *3 (N.D. Ga. May 11, 2011) (alteration in original) (quoting Manson v. Brathwaite, 432 U.S. 98, 114 (1977)), adopted by 2011 WL 2160758, at *1 (N.D. Ga. May 31, 2011). The test for determining the reliability of identification testimony is whether, when viewed in light of the

totality of the circumstances, it possesses sufficient indicia of reliability.  Manson, 432 U.S. at 114.  The factors considered in the "totality of the circumstances" analysis include: the opportunity to view the perpetrator at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the perpetrator; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation. Neil v. Biggers, 409 U.S. 188, 199-200 (1972); see also Manson, 432 U.S. at 114; Blanco v. Singletary, 943 F.2d 1477, 1508 (11th Cir. 1991); United States v. Rodger, No. CR 109-040, 2010 WL 2643268, at *17 (S.D. Ga. Apr. 16, 2010), adopted by 2010 WL 2643267, at *4 (S.D. Ga. June 30, 2010), aff'd, 521 F. App'x 824 (11th Cir. 2013) (per curiam) (unpublished).[23]  Kirkman and Arms bear the initial burden of proving that the identification procedures were unduly suggestive, and if they are

---

[23] In Manson, 432 U.S. at 98, the "United States Supreme Court refused to adopt a *per se* rule that an identification based upon examination of a single photograph would be inadmissible at trial," but rather, it "held that a trial court should adhere to the [Biggers] factors . . . to determine whether the identification has indicia of reliability such as there is no substantial likelihood of irreparable misidentification."  United States v. Causey, 834 F.2d 1277, 1284 (6th Cir. 1987) (citation omitted); see also United States v. Cruz-Rivera, 335 F. Supp. 3d 81, 90 (D. Mass. 2018) (explaining that the "use of a single photograph is permissible for future identification, provided the identification is reliable under the circumstances"), aff'd, 14 F.4th 32 (1st Cir. 2021).  That is, "the essential question is whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive."  Causey, 834 F.2d at 1284-85 (citation and internal marks omitted).

successful, the burden then shifts to the government to prove that the identifications were reliable in spite of the suggestive procedures.  United States v. Wade, 388 U.S. 218, 240 n.31 (1967).

Although the record is incomplete as to the preliminary issue surrounding the circumstances of any photos that may have been shown to Individual-1 during the SIS interview in February 2019 that Arms and Kirkman assert tainted the later descriptions and identifications by Individual-1, and because the May 2019 identification of Kirkman by Individual-1 and the July 2021 identification of Kirkman by Individual-2 involved the presentation of a single photograph, which are not per se barred but must be "viewed with suspicion" and evaluated "based on the totality of facts that the identification was nonetheless reliable," United States v. Johnson, Criminal Case Number: 1:14–CR–435–SCJ–JSA, 2015 WL 13657738, at *2 (N.D. Ga. July 15, 2015) (citations and internal marks omitted), adopted by 2015 WL 9412923, at *3 (N.D. Ga. Dec. 22, 2015), there "is no reason . . . to belabor the issue," since "what distinguishes this case is the fact that each of the cooperating witnesses had prior familiarity with the person or persons they identified" as "they were [alleged] partners in crime," United States v. Veloz, 109 F. Supp. 3d 305, 312 (D. Mass. 2015) (internal marks omitted), aff'd, 948 F.3d 418 (1st Cir. 2020).  Therefore, for the reasons that follow, the Court finds that even if the procedures surrounding the presentation of the single photo of Kirkman to

Individual-1 and Individual-2 and the photo arrays to Individual-1 were unduly suggestive, the evidence in the record indicates that the identifications of Kirkman and Arms were nonetheless reliable, and therefore, they are not subject to suppression.

### a.      Identifications of Kirkman and Arms by Individual-1

Kirkman and Arms contend that Individual-1's identification of Kirkman during the May 20, 2019, interview, and of Kirkman and Arms during the August 26, 2020, interview are unreliable because his description of Kirkman prior to being shown the single photo in May 2019 and his description of Arms in May 2019 prior to being shown the photo array in August 2020, were likely "based on the photo shown to him by SIS" during the February 2019 interview about which we have no evidence.  [Doc. 137 at 23-27; Doc. 140 at 2-5].  In addition, Kirkman contends that the Biggers factors weigh in his favor as Individual-1's exposure to him was minimal; he "denies that he [was] a co-conspirator with anyone"; that despite the government's argument that not much time elapsed between the identification and the alleged criminal conduct, "what [was] a fact [was] that not much time had lapsed between the time government officials showed Individual-1 a photo of Kirkman and then asked Individual-1 to give a description and identify Kirkman from a one man photo show-up"; that Individual-1 was "so unfamiliar with [] Kirkman[] that he [could not] even give the agents his name," but could only

identify him as "Pat"; and that he misidentified another individual as Kirkman. [Doc. 137 at 30-36 (all caps omitted)].  Kirkman further contends that the photo array presented to Individual-1 on August 26, 2020, in which he was identified, was tainted by "the previously shown unduly suggestive, single-subject photograph" and that the government "has not established that Individual-1 was identifying Kirkman, rather than simply recognizing the previously shown photo."  [Doc. 147 at 5-6 (all caps omitted)].  Similarly, Arms contends that aside from the taint from the earlier photo identification by Individual-1 that appears to have occurred in February 2019, the photo identification made by Individual-1 from a photo array on August 26, 2020, should be suppressed because Individual-1 is unreliable, as shown by the description of Arms he provided during the May 2019 interview which omitted Arms' most prominent feature, "a row of gold teeth," and his speculation that Individual-1 "did not know [] Arms," because it was "not possible that [Individual-1] and [Individual-2] delivered drugs together and [Individual-1] can readily identify Arms, but [Individual-2] has never seen him."  [Doc. 146 at 5].

Despite Kirkman and Arms' arguments to the contrary, the Court finds that the identification of Kirkman from the single photograph on May 20, 2019, and the identification of Arms from a photo array on August 26, 2020, were sufficiently reliable, and that the subsequent identification of Kirkman from a photo array

presented on August 26, 2020, was not tainted by the earlier identification and was also reliable. That is, when applying the Biggers factors for assessing the reliability of Individual-1's May 2019 identification of Kirkman and August 2020 identification of Arms, it is apparent that his identifications were reliable independent of any earlier purported taint that may have occurred in February 2019.[24]

"The most important factor here is [Individual-1's] opportunity to know, view and recognize [Kirkman and Arms]." Johnson, 2015 WL 13657738, at *3.

---

[24] Although the record is inconclusive regarding all that transpired during the interview of Individual-1 by SIS in February 2019 and whether any photos of individuals were shown to him at that time, under the circumstances presented here, including the "substantial passage of time between showings, i.e., three [and eighteen] months," it is "unlikely that [Individual-1] was influenced by [any] earlier photograph, let alone that it led to misidentification." United States v. Carter, 410 F.3d 942, 949 (7th Cir. 2005) (citation and internal marks omitted), disapproved of on other grounds by United States v. Herman, 930 F.3d 872 (7th Cir. 2019). Indeed, Kirkman asserts that Individual-1 was shown a single subject photograph in February 2019 that was "presumably the identical photograph shown to Individual-1 in May, 2019," [Doc. 147 at 2-3 (all caps and citation omitted)], but "there is nothing per se impermissible about placing the same suspect in two different identification procedures" and when considering "repetitive procedures," the focus is generally "on the mitigating effect of elapsed time between the identifications," United States v. Sanders, 708 F.3d 976, 989 (7th Cir. 2013) (citations and internal marks omitted). Nevertheless, because "reliability is the 'linchpin,' the Supreme Court has instructed courts to weigh the reliability factors against the 'corrupting effect of [any] suggestive identification itself,'" which the Court will do. United States v. Nava-Ruiz, 515 F. Supp. 2d 198, 204 (D. Mass. 2007) (quoting Manson, 432 U.S. at 114).

Specifically, "the Eleventh Circuit has [] held that, in a case in which witnesses identified a defendant after having been shown only a single photo of him, the single-photo display did not create a substantial likelihood of improper in-court identification when each of the witnesses to whom the photograph had been shown had [] a substantial independent basis for making the identification," namely, "when the witness making the identification has met the defendant on numerous occasions—as opposed to being merely an eyewitness to a single offense committed by the defendant—the identification can be considered reliable." United States v. Robinson, Criminal Action No. 1:07–CR–0138–BBM–CCH, 2007 WL 9676863, at *8 (N.D. Ga. Nov. 19, 2007) (alteration and internal marks omitted) (quoting United States v. Cannington, 729 F.2d 702, 711 (11th Cir. 1984)), adopted by 2008 WL 11383732, at *4 (N.D. Ga. Feb. 22, 2008).  "After all, this is not the case of a fleeting bystander identification, or that of a stranger," but rather, the government "adduced facts showing that [Individual-1] was a co-conspirator who regularly and frequently interacted with [Kirkman and Arms]," and that these "were direct, face-to-face interactions," which "gave [Individual-1] a strong basis to know and recognize [Kirkman and Arms]." Johnson, 2015 WL 13657738, at *3 (citations omitted).

During the May 20, 2019, interview, Individual-1 detailed that he had observed the individual he knew as "Pat" pass contraband off; that either

"Envelope" or "Pat" would let him know when contraband had been dropped off and that "Pat" would also tell him the amount of contraband that was supposed to be coming in; that he would deliver the contraband to either "Pat" or "Envelope"; that he only spoke with his cellmate, "Envelope," or "Pat" about the scheme; and that "Pat" used Cash App to pay him and that this app also had "Pat's" picture associated with the account, while "Envelope's" girlfriend paid him via Cash App.  [Doc. 124-1 at 13, 16, 19-23, 27-28, 34-35, 51-52, 94, 108, 111, 128-29, 131-41, 149-51, 170, 174].[25]  Additionally, at the April 14, 2023, evidentiary hearing, Individual-1 testified that he lived in the same unit as Kirkman for three to four years, that he saw him on a daily basis, and that he saw him even outside of delivering contraband to him, (Tr. at 229-31, 235), and Individual-2 corroborated this testimony by explaining that "Pat" was the guy Individual-1 set things up with to start and that he accompanied Individual-1 on a number of occasions to deliver contraband to "Pat" during which he observed the two of them conversing all the time, (Tr. at 150-53, 155-56, 169-70, 179, 190-91).  In addition, Individual-1 testified that he also delivered contraband to "Envelope," that they were together

---

[25] During the August 26, 2020, interview, Individual-1 stated that he did not know "Envelope's" name but just that "everyone call[ed him] Envelope" and that while he knew Kirkman's name, "everybody called him Pat."  [Doc. 124-3 at 68-69].

at USP Atlanta for about three to four years and that he saw "Envelope" "pretty much all the time."  (Tr. at 234-36).

Moreover, as relevant to the third Biggers factor, Individual-1 provided a description of Kirkman prior to making an identification during the May 20, 2019, interview, which included that he was an approximately 40-year-old, 5'10" black male who weighed about 230 to 240 pounds and was from Alabama, which was reasonably accurate, other than his age, as Kirkman was a 32-year-old, 5'10" black male who weighed between 189 to 262 pounds and was from Alabama.  [Doc. 122-1 at 4; Doc. 124-1 at 11-12; Doc. 145 at 10 & n.9].   He similarly provided a description of Arms during the May 2019 interview, which included that he was a 30-year-old, 5'10" "[b]lack guy" with "long dreads" from Chattanooga who weighed about 200 pounds, which aside from his age, which was actually 38 at that time, was reasonably accurate.  [Doc. 122-4 at 2-3; Doc. 124-1 at 14-16, 30; Doc. 145 at 19 & n.17].[26]   Any discrepancies in these descriptions "are negligible."

---

[26] Kirkman faults the agents for failing to inquire about other specific identifying characteristics, "such as hair style, scars, marks or tattoos," as they had inquired when identifying characteristics of other inmates, particularly since Kirkman is "amply tattooed," [Doc. 137 at 27-30 (emphasis omitted)], and Arms similarly contests the accuracy of the description since Individual-1 did not mention Arms' "row of gold teeth," [Doc. 146 at 5].   Arms also disputes that he was from Chattanooga, Tennessee, since he was convicted in the Middle District of Tennessee, while Chattanooga is in the Eastern District of Tennessee, [id.], but the mere fact that Arms was convicted in another district does not contradict Individual-1's testimony that Arms was from Chattanooga.   And, as the

United States v. Sierra, No. 2:07-CR-93, 2008 WL 1752213, at *4 (D. Utah Apr. 14,

2008), aff'd, 390 F. App'x 793 (10th Cir. 2010) (unpublished); see also United States

v. Owens, CRIMINAL CASE NO. 1:09-CR-0286-RWS-JFK, 2010 WL 11508019, at

*8 (N.D. Ga. Mar. 11, 2010) (finding that "[w]hile the description of the first

[suspect] by the witnesses was not perfect," including the discrepancy in the age

of the suspect, "they provided sufficient general characteristics matching [the

suspect's] physical attributes"), adopted by 2010 WL 11520588, at *1 (N.D. Ga. Apr.

7, 2010), aff'd, 445 F. App'x 209 (11th Cir. 2011) (per curiam) (unpublished).

Moreover, with regard to the fourth Biggers factor, Agent Brock testified,

and the recording of the May 20, 2019, interview confirms, that Individual-1 did

not express any hesitation or confusion when he identified Kirkman.  (Tr. at 41-42;

Gov. Ex. 1 at 8:44-10:46); see also United States v. Castro, 243 F. Supp. 2d 565, 572

(W.D. Va. 2003) (footnote and citation omitted) (finding officer's testimony that

the witness "never hesitated in his assertion that the photograph [was] of

---

government asserts, neither Kirkman nor Arms have explained why these
assertions "undermine[] the accuracy of Individual-[1]'s description or the
reliability of his identification[s]," [Doc. 145 at 11].  In addition, while Kirkman
takes issue with the fact that Individual-1 did not know Kirkman's name and that
it was actually provided by the agents, [Doc. 137 at 26, 32; Doc. 147 at 4 (citation
omitted)], Individual-1 specifically identified  him as "Pat" and that he knew him
"as Pat," [Doc. 124-1 at 12], which "suggests that [Individual-1] was not just
parroting back facts," Johnson, 2015 WL 13657738, at *3.

[defendant]" satisfied the fourth reliability factor).[27]   Likewise, when presented with the photo array at the August 26, 2020, interview, Individual-1 immediately identified Arms as "Envelope" and indicated that he was "[o]ne hundred percent[]" positive that was him, even though it "was a bad picture of him" and was "a little out of focus[,]" [Doc. 124-3 at 81-82], and Agent Fehlman testified that Individual-1 did not express any hesitation while identifying individuals from the photo arrays, (Tr. at 94-95).   And, as to the final factor, only a few months had lapsed between Individual-1 identifying Kirkman on May 20, 2019, and when the alleged criminal conduct ended in February 2019, see [Doc. 124-1]; see also [Doc. 145 at 11], and "courts have determined that a period of four months between a witnesses' observation and identification of a suspect is not too lengthy a period of time to render an identification unreliable," United States v. Lisbon, No. 1:10–

---

[27] Kirkman challenges Individual-1's reliability by arguing that Individual-1 "tentatively identifie[d] the subject [in a photo obtained from Individual-1's cellphone] as [] Kirkman, although it [was] not." [Doc. 137 at 33].  In particular, Kirkman maintains that Individual-1 "mistakenly identifie[d] a police officer in a photograph on his own phone as [] Kirkman." [Id. at 34].  Individual-1, however, did not make a positive pretrial identification as to the photograph at issue, but initially said that he could not identify the individual in the photo and detailed that he saw a cop with a badge that looked like Kirkman, though he could not tell with the glasses, and that he "really [could not] tell" as it "does and it don't." [Doc. 124-3 at 112-13].  Thus, Individual-1 could not positively identify the individual depicted in the photograph presented to him in August 2020 and therefore, there was no misidentification at issue.  See Castro, 243 F. Supp. 2d at 572-73.

CR–251–10–TWT/AJB, 2012 WL 1068618, at *6 (N.D. Ga. Feb. 26, 2012) (citations omitted), adopted by 2012 WL 1068590, at *1 (N.D. Ga. Mar. 29, 2012).  While approximately eighteen months had lapsed between Individual-1's identification of Arms in August 2020 and when the smuggling scheme was discovered in February 2019, the "Eleventh Circuit . . . has declined to find that periods of time from eight months to six years between commission of the crime and the identification mandates exclusion of identification evidence," Owens, 2010 WL 11508019, at *9 (citations omitted).

"[W]hen someone already familiar with a suspect is asked to comment on whether a recorded voice or image portrays the suspect . . . concerns [about the prejudicial effect of undue suggestiveness] are absent." United States v. Omar, 786 F.3d 1104, 1109–10 (8th Cir. 2015) (second and third alterations in original) (citation and internal marks omitted); see also United States v. Blair, CRIMINAL ACTION NO. 1:18-cr-00260-LMM-CMS-1, 2021 WL 4267949, at *9 (N.D. Ga. June 4, 2021) (citations omitted) (explaining that considering "the prior relationship of the witnesses to [defendant], their photographic identifications of him [were], by their very nature, reliable"), adopted by 2021 WL 3674173, at *6 (N.D. Ga. Aug. 18, 2021). Quite simply, "[t]hese circumstances existed here." Omar, 786 F.3d at 1110 (footnote omitted); see also United States v. Moore, 240 F. App'x 699, 705–06 (6th Cir. 2007) (unpublished) (finding witness' "extensive contacts" with defendant

"greatly diminish[ed] any risk of misidentification" where the witness "had many opportunities to observe [defendant]" during drug transactions); United States v. Dobbs, 449 F.3d 904, 909–10 (8th Cir. 2006) (footnote omitted) (explaining that defendants' arguments as to the admission of identification evidence were misplaced, since the witnesses involved "were not eyewitnesses being asked to recall their impression of a stranger during a short encounter in the emotionally charged context of an armed robbery," but "were individuals already acquainted with [defendants]," and that "[w]hen an eyewitness is shown an improper lineup or photo array, undue suggestiveness may be prejudicial because the suggestiveness may cause the eyewitness to falsely recollect the face of the person who committed the offense," whereas "when someone already familiar with a suspect is asked to comment on whether . . . [an] image portrays the suspect, these concerns are absent"); United States v. Johnson, 114 F.3d 435, 442 (4th Cir. 1997) (finding application of the reliability factors clearly demonstrated that witness' identification was sufficiently reliable where witness was defendant's co-conspirator who "had more than an adequate opportunity to observe [defendant]," that the witness "paid close attention to his coconspirator," that the witness "provided a description of his co-conspirator . . . which largely matched [defendant's] description," that the agent testified that the witness "expressed no hesitance at the [] identification of [defendant] from the single photograph," and

that the witness identified defendant within close proximity in time to the criminal conduct); United States v. Nersesian, 824 F.2d 1294, 1318 (2d Cir. 1987) (finding witness' identification "was reliable independent of the pretrial procedures," where the witness "had a sufficient opportunity to view [the suspect]," since he "was involved in drug transactions with [the suspect] on two separate occasions, each lasting at least fifteen minutes, and both involving conversations between the two men"); United States v. Mosquera-Murillo, 153 F. Supp. 3d 130, 206-07 (D.D.C. 2015) (finding that "notwithstanding slight weaknesses in identification procedures employed by [the a]gent," the totality of the circumstances confirmed that the identifications were sufficiently reliable where the witnesses had sustained interactions with defendant, including participating in a meeting during which respective roles in the conspiracy were discussed; one of the witnesses provided a detailed and accurate description of defendant; and that one of the witnesses was able to immediately identify defendant within months of interacting with him), aff'd, 902 F.3d 285 (D.C. Cir. 2018).  Thus, as the government contends, "each of the *Biggers* factors weighs in favor of reliability" as to Individual-1's identifications of Kirkman on May 20, 2019, and of Arms on August 26, 2020.  [Doc. 145 at 12].[28]   While "there are grounds by which a jury might

---

[28] Because Kirkman's challenge to the photo array presented to Individual-1 on August 26, 2020, in which he identified Kirkman, is based on the purported "taint

disbelieve [Individual-1]'s identification," the fact "that credible issues remain for a jury to resolve does not mean that suppression is warranted" and here, "[t]here are sufficient facts as to reliability such that admission of [Individual-1]'s identification[s of Kirkman and Arms] would not violate the Fifth Amendment." Johnson, 2015 WL 13657738, at *3 (citation omitted).

### b.    Identification of Kirkman by Individual-2

Kirkman argues that the pretrial identification of him from a single photograph by Individual-2 presented during an interview on July 20, 2021, is unreliable and "satisfies none of the Biggers factors[.]" [Doc. 137 at 4-17]; see also [Doc. 147 at 7-14].  In response, the government "agrees that the agents showed Individual-[2] a single photo of Kirkman during his July 2021 interview," but maintains that "even if showing Individual-[2] a single photo of Kirkman was unduly suggestive, his out-of-court identification [was] nonetheless reliable." [Doc. 145 at 21].  For the reasons that follow, the Court agrees.

First, the Court finds that Individual-2 had multiple opportunities to view Kirkman and pay close attention to him, satisfying the first two Biggers factors.  In

---

of the previously shown unduly suggestive, single-subject photograph," [Doc. 147 at 6], this argument is without merit since the Court has found that the identification on May 20, 2019, was sufficiently reliable.  Moreover, for the reasons already discussed, the Court also concludes that the identification Individual-1 made on August 26, 2020, likewise is sufficiently reliable.

particular, during the July 20, 2021, interview, Individual-2 explained that Individual-1 introduced him to "Pat" on the "yard one day" and that he delivered contraband to "Pat's cell."  [Doc. 124-5 at 125, 128-29, 154-55].  At the April 14, 2023, evidentiary hearing, Individual-2 testified that he delivered contraband to "Pat's" cell and observed Individual-1 and "Pat" talking "all the time"; while he did not personally know "Pat," he knew who he was and would recognize him; he had been introduced to "Pat" once "out on the yard"; he would see "Pat" almost every time he delivered contraband; and, he also observed "Pat" at other times "just in the chow hall or in the commissary[.]"  (Tr. at 148-53, 155-56, 163, 168-70, 179, 188-91).  Individual-2 reiterated that although it had been five years, he would know "Pat" when he saw him, and he further explained that if asked to provide a description of his lawyer two years after the hearing, he would not be able to or may be able to provide only a general description, but if he saw her, he would recognize her, and that while he did not initially recall exactly what "Pat" looked like since it had been three years, when he saw his picture, he knew who he was. (Tr. at 157, 180-81, 188, 191).  Kirkman disputes Individual-2's testimony, asserting that he "did not have a good opportunity to view [] Kirkman in the yard" or "during the alleged contraband deliveries," and that "[i]n neither case[, was] Individual-2 able to focus his attention on [] Kirkman."  [Doc. 137 at 10-11, 14 (all caps omitted)].  However, Kirkman's argument rests on conjecture rather than

evidence and fails to take into account Individual-2's testimony that he also saw Kirkman at other times "just in the chow hall or in the commissary[.]" (Tr. at 148-53, 155-56, 163, 168-70, 179, 188-91), and the Court "therefore rejects [Kirkman's] argument that [Individual-2] did not have sufficient opportunity to view him," and "[g]iven [the] evidence[,] . . . the [Court] concludes that [Individual-2] had the opportunity to pay, and in fact paid, close attention to [Kirkman]." Lisbon, 2012 WL 1068618, at *6. Indeed, as with Individual-1, Individual-2 "was an active coconspirator" and his testimony "established that [he] had 'sufficient familiarity' with [Kirkman], also known as '[Pat],' 'so as to render [his] identification independently reliable.'" United States v. Harris, Crim. Action No. 2:12–cr–65–wks–1, 2018 WL 1517216, at *18 (D. Vt. Feb. 27, 2018) (citations and internal marks omitted), adopted by 2018 WL 1582423, at *1 (D. Vt. Mar. 27, 2018).

As to the third Biggers factor, the government concedes that "it is true that Individual-[2] did not provide a description of Kirkman to the agents before being shown the photo," [Doc. 145 at 24], and, the agents provided a description of Kirkman to him prior to showing him the photo during the July 2021 interview, [Doc. 124-5 at 128-29]. While "[i]t is unfortunate that the agent[s provided a physical description of Kirkman rather than Individual-2 providing the description,] prior to displaying any photograph," the "record includes other facts that support the accuracy and reliability of [Individual-2]'s recollection," Johnson,

2015 WL 13657738, at *3, including that Individual-2 explained that while it had been a few years since he had seen Kirkman, he would recognize him when he saw him, (Tr. at 188, 191).  And, while Kirkman challenges the fourth factor by pointing to Individual-2's statements after being shown the photo that it "might be Pat" and that "I think it is Pat," to show Individual-2 was not certain in his identification, [Doc. 137 at 17]; see also [Doc. 124-5 at 182], Individual-2 testified at the evidentiary hearing that when he was shown the photo in July 2021, he was "[v]ery confident" in his identification and had no doubt in his mind that the individual in the photo was "Pat," (Tr. at 160-61, 186-88, 191-92).

Kirkman also contends that the amount of time that had elapsed between Individual-2's identification in July 2021 and the discovery of the smuggling scheme in February 2019 weighs in his favor as to the reliability of Individual-2's identification, [Doc. 147 at 10-14], and he spends a great portion of his brief challenging Individual-2's credibility based on Individual-2's lack of ability to provide a description of "Pat" to the agents during the July 2021 interview, that he had to be prompted with the name "Pat" during the interview, and that he did not appear to be certain in his identification since he said it might be "Pat," yet he was able to provide a description during the evidentiary hearing and testify that he was confident in identification, see [id.], but "[a]ny uncertainty [Individual-2] expressed goes to the weight to be accorded to [his] testimony[ and] does not

70

render [his] identification unreliable or inadmissible," United States v. Ford, Criminal Action No. 1:12–CR–297–TWT–ECS, 2013 WL 1969876, at *4 (N.D. Ga. Apr. 8, 2013), adopted by 2013 WL 1966232, at *1 (N.D. Ga. May 10, 2013), aff'd, 784 F.3d 1386 (11th Cir. 2015); see also Causey, 834 F.2d at 1285 (explaining that while defendant could "point to several reasons why the accuracy of [the witness'] testimony [was] questionable, . . . they go to the weight of the testimony and [were] not enough to render the testimony inadmissible"). Furthermore, "any negative inference raised by the lapse of time is more than offset by the other factors weighing in favor of reliability." United States v. Gay, CRIMINAL CASE NO. 1:09-CR-335-CAP-RGV, 2010 WL 11507396, at *9 (N.D. Ga. Jan. 19, 2010) (citation omitted), adopted by 2010 WL 11520591, at *1 (N.D. Ga. Mar. 8, 2010), aff'd, 423 F. App'x 873 (11th Cir. 2011) (per curiam) (unpublished). Thus, after applying the Biggers factors, the Court finds that Individual-2's identification on July 20, 2021, is sufficiently reliable and that there is no substantial risk of misidentification.[29]

---

[29] Kirkman, relying on United States v. Rogers, 387 F.3d 925 (7th Cir. 2004), argues that the "reliability of Individual-2 as a witness to the identification of [ him] was hopelessly compromised by events which occurred in the course of the [e]videntiary [h]earing," since Individual-2 "encountered [] Kirkman[.]" [Doc. 137 at 18-19 (all caps omitted)]. However, as the government points out, aside from the fact that "there was no evidence developed at the evidentiary hearing that Individual-[2] saw Kirkman," whether "Individual-2 did so or not has no bearing on whether Individual-[2]'s earlier identification of Kirkman was reliable," and

Accordingly, Kirkman and Arms' arguments regarding the out of court photographic identifications by Individual-1 and Individual 2 are without merit, and because they have not identified any legitimate basis for suppression, it is **RECOMMENDED** that the motion to suppress, [Doc. 72], as adopted, [Doc. 75], be **DENIED**.

## III.   CONCLUSION

For the foregoing reasons, Kirkman's motions to adopt, [Docs. 63, 64, 65, & 75], are **GRANTED**, Shackelford and Kirkman's motion for bill of particulars, [Doc. 57], is **DENIED**, and it is **RECOMMENDED** that Shackelford and Kirkman's motions to dismiss, [Docs. 58 & 59], and Arms and Kirkman's motion to suppress evidence, [Doc. 72], be **DENIED**.[30]

**IT IS SO ORDERED** and **RECOMMENDED**, this 17th day of November, 2023.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

that Kirkman's reliance on <u>Rogers</u>, for the reasons set forth by the government, is "both factually and legally inapposite." [Doc. 145 at 26-27 (emphasis omitted)].

[30] One other motion remains pending before the undersigned, so the case is not yet certified as ready for trial pending resolution of that motion. <u>See</u> [Doc. 157 (under seal)].