# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

PATRICK SHACKELFORD and
PATRICK KIRKMAN,

     Defendants.

CRIMINAL CASE NO.
1:21-cr-00454-WMR-RGV

## <u>ORDER</u>

This matter is before the Court on the Magistrate Judge's Order and Report and Recommendation ("R&R") [Doc. 158], which denied Defendants Patrick Shackelford and Patrick Kirkman's Motion for Bill of Particulars [Doc. 57] and recommends that Shackelford and Kirkland's two Motions to Dismiss [Docs. 58, 59] and Kirkman's[1] Motion to Suppress Out of Court Photographic Evidence [Doc. 72] be denied. Both Kirkman and Shakelford filed Objections to the R&R. [Docs. 171, 174]. After due consideration, the Court adopts the R&R.

---

[1] Defendant Mitchell Arms originally filed this Motion, but he has since entered a guilty plea. [Doc. 223]. Accordingly, his motion is waived, and the Court will only address the portions of his motion relevant to Defendant Kirkman.

1

## I.    Background

The Indictment alleges that Shackelford and Kirkman smuggled cell phones, marijuana, methamphetamine, and other controlled substances into the United States Penitentiary in Atlanta, Georgia (the "Prison"). At the time, Shackelford was a Correctional Officer serving as a plumbing supervisor at the Prison, overseeing inmates who performed plumbing services. [Doc. 1]. He leveraged this position to facilitate the alleged misconduct with inmates, including Kirkman, Mitchell Arms (a former co-defendant), and two other inmates who provided identifications, Individual-1 and Individual-2 (the "Witnesses"). [*Id*.].

The contraband entered the prison through a hole created by the Witnesses in the wall between a ward used for suicide watch and the visitor's bathroom. [*Id*.]. Shackelford would escort the Witnesses to pick up the contraband weekly, and the contraband would be stored in the ceiling above Shackelford's office. [*Id*.]. Then, the contraband would be passed to Kirkman and Arms, who would distribute it to other inmates in the prison. [*Id*.]. In exchange for his help, Shackelford received pain pills and approximately $5,000, largely paid by Kirkman. [*Id*.].

A federal grand jury returned an indictment charging Shackelford and Kirkman with one count of conspiracy to commit bribery (Count One), in violation of 18 U.S.C. § 371; Shackelford and Kirkman with one count of conspiracy to provide and obtain and possess prohibited objects (Count Two), in violation of 18

U.S.C. § 371; Shackelford with one count of bribery (Count Three), in violation of 18 U.S.C. § 201(b)(2)(A); Shackelford with three counts of providing prohibited objects (Counts Four through Six), in violation of 18 U.S.C. §§ 1791(a)(1), 1791(b)(1), (3)–(4), 1791(d)(1)(B)–(C), (F); Kirkman with two counts of possessing, obtaining, and attempting to obtain prohibited objects (Counts Seven and Eight), in violation of 18 U.S.C. §§ 1791(a)(2), 1791(b)(1), (3), 1791(d)(1)(B)–(C); and Shackelford and Kirkman with one count of drug conspiracy (Count Nine), in violation of 21 U.S.C. § 846. [*Id.*].

## II. Legal Standard

The Defendants challenge both the Magistrate Judge's order on the Bill of Particulars and its recommendation regarding the Motions to Dismiss and Motion to Suppress. When reviewing objections to a magistrate judge's *order*, the Court must "modify or set aside any part of the order that is contrary to law or clearly erroneous." Fed. R. Crim. P. 59(a). On the other hand, when reviewing objections to a magistrate judge's *recommendation*, this Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b).

"Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to. Frivolous, conclusory, or general objections need not be considered by the district court." *United States v. Schultz*, 565

F.3d 1353, 1361 (11th Cir. 2009) (citations omitted). If no specific objections are made or no objections are made at all, "the appropriate standard of review for the report and recommendation is clear error." *Lattimore v. Bank of Am.*, N.A., 2014 WL 11456272, at *1 (N.D. Ga. Feb. 10, 2014), *aff'd sub nom. Lattimore v. Bank of Am. Home Loans*, 591 F. App'x 693 (11th Cir. 2015). Both Kirkman and Shackelford have filed timely objections to the R&R in this case, so the Court reviews the challenged portions of the R&R's recommendations de novo and the remainder of the R&R for clear error.[2]

## III.  Discussion

### A. Motion for a Bill of Particulars

Shackelford and Kirkman argue that the Indictment is insufficiently particular and thereby violates due process. More specifically, the Defendants complain that the Indictment does not specifically define what "things of value" were paid to Shackelford, what "official acts" he performed, what "other prohibited objects" were brought into the prison, and what "overt acts" are alleged. The Magistrate Judge concluded that the Bill of Particulars was unnecessary because the information was "already evident from other sources," including "in the [I]ndictment and in

---

[2] There are two outstanding motions regarding the Parties' responses to the Magistrate Judge's R&R. [Doc. 128]. Kirkman's Motion to Extend Time for Filing Objections [Doc. 163] is **GRANTED**. The Government's Motion to File Oversized Response Brief [Doc. 185] is **GRANTED**.

discovery." [Doc. 158 at 14]. This Court concludes that the Magistrate Judge's decision was not "contrary to law or clearly erroneous." Fed. R. Crim. P. 59(a).

"The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985). "It is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial." *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980); *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir. 1986) ("A bill of particulars may not be used to compel the government to provide the essential facts regarding the existence and formation of a conspiracy. Nor is the government required to provide defendants with all overt acts that might be proven at trial"); *United States v. Diecidue*, 603 F.2d 535, 563 (5th Cir. 1979) ("this Court has found that defendants are subjected to no prejudice in conspiracy trials where the Government proves overt acts not stated in the indictment or a bill of particulars"). Additionally, a defendant is not "entitled to a bill of particulars with respect to information which is already available through other sources such as the indictment or discovery and inspection." *Rosenthal*, 793 F.2d at 1214; *United States v. Colson*, 662 F.2d 1389, 1391 (11th Cir. 1981) ("[G]eneralized discovery is not a proper purpose in seeking a bill of particulars").

5

The Magistrate Judge concluded that the Indictment was "detailed and legally sufficient" and "describe[d] the object and manner and means of the allege[d] conspiracy and bribery scheme, as well as the role of each co-conspirator." [Doc. 158 at 18]. After reviewing the Indictment, this Court agrees and finds that the Magistrate Judge's review was not clearly erroneous. For example, the Defendants complain that the Indictment is insufficiently particular regarding what "things of value" were transferred to Shackelford. But, the Indictment describes that Shackelford was paid $5,000 in cash and received pain pills.

And, as noted by the Magistrate Judge, the evidence in this case should largely consist of activities in which the Defendants participated in, and therefore would be aware of. *See, e.g.*, *Cole*, 755 F.2d at 760 (concluding that the defendants "could hardly have been surprised by the government's proof at trial" where "the evidence consist[ed] mainly" of "conversations and activities in which [the defendants] participated"). To the extent that the Defendants' argument that they cannot be aware of the activities in this case because they are innocent has merit, the discovery produced should be sufficient to fill in the gaps. Accordingly, the Court sees no clear error in the Magistrate Judge's denial of the Bill of Particulars, and the Motion for Bill of Particulars [Doc. 57] is **DENIED**.

**B. Motion to Dismiss for Duplicity**

Shackelford and Kirkman argue that Count Two of the Indictment should be dismissed as duplicitous because it "charges two or more separate and distinct offenses." [Doc. 58 at 2]. Count Two alleges that the Defendants violated 18 U.S.C. § 371[3] by conspiring to provide, obtain, and possess prohibited objects in violation of 18 U.S.C. § 1791.[4] More specifically, Count Two alleges that the Defendants:

> did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with each other and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:
>
> a. in violation of a statute and a rule and order issued under a statute, to provide to inmates of USP Atlanta prohibited objects, namely methamphetamine and marijuana, and attempt to do so; in violation of [18 U.S.C. §] 1791(a)(1); and
>
> b. to permit inmates of USP Atlanta to possess, obtain, and attempt to obtain prohibited objects, namely methamphetamine and marijuana, in violation of [18 U.S.C. §] 1792(a)(2).

---

[3] 18 U.S.C. § 371 provides that:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

[4] 18 U.S.C. § 1791(a) provides that whoever:

> (1) in violation of a statute or a rule or order issued under a statute, provides to an inmate of a prison a prohibited object, or attempts to do so; or
> (2) being an inmate of a prison, makes, possesses, or obtains, or attempts to make or obtain, a prohibited object;
> shall be punished as provided in subsection (b) of this section.

[Doc. 1 at 5–6]. The Defendants argue that Count Two is duplicitous because the conspiracy is predicated both on *providing* and *receiving* a prohibited item. But, this argument misses the mark because the Indictment simply charges a single count of conspiracy.

"A count is duplicitous if it charges two or more separate and distinct offenses." *United States v. Schlei*, 122 F.3d 944, 977 (11th Cir. 1997). But, "[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime, and that is one, however diverse its objects." *Braverman v. United States*, 317 U.S. 49, 54 (1942) ("A conspiracy is not the commission of the crime which it contemplates, and neither violates nor 'arises' under the statute whose violation is its object"). Additionally, an "indictment is not duplicitous if, in one count, it charges a defendant with violating the statute in [two] ways." *United States v. Burton*, 871 F.2d 1566, 1573 (11th Cir. 1989).

As the Magistrate Judge pointed out, the crime charged in Count Two is actually the § 371 conspiracy and not the § 1791(a) violations; it is not duplicitous merely because it alleges multiple objectives of the conspiracy. Accordingly, the Defendants' Motion to Dismiss for Duplicity [Doc. 58] is **DENIED**.

### C. Motion to Dismiss for Multiplicity

Shackelford and Kirkman argue that this Court should dismiss Counts Four through Seven as multiplicitous. "An indictment is multiplicitous if it charges a single offense in more than one count." *United States v. Woods*, 684 F.3d 1045, 1060 (11th Cir. 2012). The operative question is "whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932); *Woods*, 684 F.3d at 1060 ("an indictment [is] not multiplicitous if the charges differ by even a single element or alleged fact").

Counts Four, Five, and Six charge Shackelford with providing and attempting to provide prohibited objects to inmates in violation of 18 U.S.C. § 1791(a)(1). [Doc. 1 at 8–9 (the prohibited objects alleged are methamphetamine in Count Four, marijuana in Count Five, and cellular phones in Count Six)]. Counts Seven and Eight charge Kirkman with possessing, maintaining, and attempting to maintain prohibited objects in violation of 18 U.S.C. § 1791(a)(2). [*Id.* at 9–10 (the prohibited objects are methamphetamine in Count Seven and marijuana in Count Eight)]. Notably, the type of "prohibited object" is an element that the Government must prove in both § 1791(a)(1) and (2). It follows that the Magistrate Judge correctly concluded that because the counts relate to different prohibited objects, the counts each require a distinct element of proof and are therefore not multiplicitous. [Doc. 158 at 30]; *cf. United States v. Maldonado*, 849 F.2d 522, 524 (11th Cir. 1988) (holding that two

9

counts of cocaine possession in violation of 21 U.S.C.A. § 841(a)(1) were not multiplicitous because the cocaine was possessed in two different places in two different quantities); *Butler v. United States*, No. 19-10092-A, 2019 U.S. App. LEXIS 22152 at *2 (11th Cir. July 24, 2019) ("His indictment was not multiplicitous because each of the alleged multiplicitous drug possession charges required proof of a different type of drug"). Accordingly, the Motion to Dismiss for Multiplicity [Doc. 59] is **DENIED**.

### D. Motion to Suppress Evidence of Out of Court Identification

Kirkman asks the Court to suppress both Individual-1 and Individual-2's out-of-court identifications, and any future in-court identifications, of him as tainted and unreliable. [Docs. 75, 137]. Out-of-court identifications undergo a two-step analysis. *See Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988). First, the Court determines if the original identification procedure was unduly suggestive. *Id*. If it was unduly suggestive, the Court then considers whether, in light of the totality of the circumstances, the identification was nonetheless reliable. *Id*. In doing so, the Court considers five factors (the "Biggers factors")—(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *See Neil v. Biggers*, 409 U.S. 188,

10

199 (1972). After review, the Court determines that although the officer's procedures were unduly suggestive, both of the identifications were sufficiently reliable and therefore are admissible.

### i. Relevant Facts

#### a. Individual-1's Interviews

There is evidence of five interviews of Individual-1 in the record, but only three involved discussions of Kirkman.[5] First, in May 2019, Individual-1 stated that a man named "Pat" was acting as a distributor to help another inmate sell drugs within the Prison. [Doc. 124-1 at 11–13]. He could not remember Pat's last name but described him as a "[b]lack guy" from Alabama who was about five feet and ten inches tall, forty years old, and roughly 230–40 pounds. [*Id*. at 12]. The agents then showed Individual-1 a single photo of Kirkman, who he identified as Pat and explained that he had "seen him pass stuff off." [Docs. 124-1 at 13; 124-2]. The questioning agents testified at an evidentiary hearing that Individual-1 showed no hesitation when identifying Kirkman during this interview. [Doc. 128 at 42, 94].

Second, at an interview in August 2020, Individual-1 identified Kirkman in two photo lineups. [Doc. 124-4 at 5, 7; Doc. 124-3 at 81; Doc. 128 at 88–89]. After

---

[5] The other two interviews were conducted in January and February 2019, and although Individual-1 was shown pictures of Shackelford and contraband at the February interview, there is no evidence in the record that Kirkman was discussed or a picture of Kirkman was used. [Doc. 128 at 202–03].

the first lineup, Individual-1 indicated that he was "[o]ne hundred percent positive" about his identification. [Doc. 124-3 at 79; Doc. 124-4 at 5; Doc. 128 at 95]. The agents then showed Individual-1 a photo taken from his phone, and after stating that he did not recognize the person, he then said it resembled Patrick[6] but he could not tell. [Doc. 124-3 at 112–13].

Finally, in May 2021, Individual-1 confirmed that Kirkman's first name was Patrick after he commented that he was "trying to think of his first name. Pat, Patrick, Pat's, I can't think of his—" and the agent supplied the name Patrick.[7] [Doc. 174 at 23]. Individual-1 also testified at an evidentiary hearing.

During these interviews, Individual-1 explained that "Envelope"[8] and Pat would tell him what color package to expect, he would pick up the contraband from the hole in the bathroom, and then pass it to Envelope and Pat to distribute. [Docs. 124-1 at 172–74; 124-3 at 17–20]. He went up to the bathroom to collect contraband almost every weekend for about six months.[9] [*Id.* at 37]. In exchange, he was paid,

---

[6] The Court acknowledges that both Kirkman and Shackelford's first names are Patrick. But, notably, one of the questioning agents testified at an evidentiary hearing that Individual-1 always referred to Kirkman as "Pat" and Shackelford as "Shack," so he did not observe any confusion as to who was being discussed. [Doc. 128 at 94–95].

[7] The complete transcript of this interview has not been submitted to the Court.

[8] Individual-1 identified "Envelope" as Arms. [Docs. 124-1 at 14–15, 30; 124-3 at 81; 124-4 at 3].

[9] Individual-1 testified that while the contraband scheme went on for about six months, there was a shutdown during the scheme, so contraband only came into the prison for about three months. [Doc. 128 at 241].

mainly by Pat, via Cash App. [*Id*. at 51]. Notably, Individual-1 identified Pat's Cash App account and noted that the profile included a photograph of Kirkman. [*Id*. at 51, 139]. He testified that he did not need the photo to identify Kirkman because he knew him and delivered contraband to him daily. [Doc. 128 at 226, 230–31].

### b. Individual-2's Interviews

There is evidence of three interviews of Individual-2, but only one is relevant here.[10] In July 2021, Individual-2 told an agent that Individual-1 introduced him to another inmate, who he clarified was Pat after the name was suggested by an agent. [Doc. 124-5 at 127]. He said he did not remember Pat's last name or exactly what he looked like, but he remembered the name Pat. [*Id*. at 128]. He assisted Individual-1 in delivering the contraband, often to Pat's cell. [*Id*. at 155]. The agents showed Individual-2 a photo, to which he responded, "There's something on his face right there . . . Yeah. That might be Pat." [*Id*. at 182]. He then said that he thought it was Pat in the photo. [*Id*.].

Individual-2 also testified during the evidentiary hearing that he worked in the plumbing department at the Prison with Individual-1. [Doc. 128 at 146]. He clarified that while he was introduced to Kirkman once on the yard, he did not know him personally. [*Id*. at 151]. But, he would see Kirkman "practically every time [he and

---

[10] The others occurred in February and July 2019. At the July interview, Individual-2 was asked about his involvement in the contraband scheme, but he denied any involvement and asked for an attorney. [Doc. 174 at 21–22; 128 at 70, 171–72].

Individual-1] took the contraband up to the units. And I would see him other times just in the chow hall or in the commissary or out on the yard or something." [*Id*. at 189–90]. The Witnesses created the hole in the bathroom and would take the contraband to the unit where both Kirkman and Individual-1 resided. [*Id*. at 136, 150, 171]. He saw Kirkman and Individual-1 talking often, and although he only met Kirkman face-to-face one time, he testified that he would recognize him if he saw him walking around the prison. [*Id*. at 152]. Individual-2 described Kirkman as "Black guy. 30, 35 years old. Stocky guy. A little shorter than [six feet]." [*Id*. at 156]. He testified that he was very confident in his identification of Kirkman during his prior interview and said that neither seeing the single photo of Kirkman nor hearing the agent's description of Kirkman had any effect on his identification. [*Id*. at 161, 191].

### ii.  Analysis of Individual-1's Identification

Individual-1 first identified Kirkman after being shown a single photo. [Docs. 124-1; 124-2]. While single photo identifications are not *per se* inadmissible, they should be viewed with suspicion. *See Manson v. Braithwaite* 432 U.S. 98 109, 112 (1977); *United States v. Jean*, 315 F. App'x 907, 912 (11th Cir. 2009). The admissibility of single photo identifications should therefore be decided based upon their reliability, using the *Biggers* factors. *See Manson* 432 U.S. at 114. In doing so, this Court notes that it will "not evaluate [a] witnesses' credibility. Such

determinations are within the exclusive province of the jury." *United States v. Billue*, 994 F.2d 1562, 1565 (11th Cir. 1993).

First, the Court finds that the opportunity of the witness to view the criminal at the time of the crime weighs in favor of reliability. *See Neil* 409 U.S. at 199. Individual-1 consistently delivered contraband to Kirkman for months, was paid by Kirkman from a Cash App profile including Kirkman's photograph, and Individual-2 testified that he saw Individual-1 and Kirkman interacting often. [Docs. 124-2 at 13, 139; 128 at 150, 152]. Given the level of interaction between the two, the Court finds that Individual-1 had ample opportunity to view Kirkman. *See*, *e.g.*, *Williams v. Warden*, 814 F. App'x 477, 480 (11th Cir. 2020) (stating that the witness had ample opportunity to view the defendant after speaking to him face-to-face for three to four minutes).

Second, the witness' degree of attention weighs in favor of reliability. *See Neil* 409 U.S. at 199. During the May 2019 interview, Individual-1 gave a detailed description of Kirkman, including race, height, weight, age, and state of origin. [Doc. 124-1 at 12]. Additionally, at the evidentiary hearing, Individual-1 testified that he did not need to see a photo in order to identify Kirkman, since he knew who Kirkman was before seeing a photo. [Doc. 128 at 231]. Given Individual-1's detailed description of Kirkman's physical characteristics prior to seeing a photo of him and that Individual-1 was directly involved with the conspiracy in which Kirkman is

15

accused of participating, the second factor is satisfied. *See Hawkins v. Sec'y, Fla. Dep't of Corr.*, 219 F. App'x 904, 907 (11th Cir. 2007) (noting that "both witnesses paid close enough attention that they were able to give a detailed description of the assailant"); *see, e.g.*, *United States v. Mariano*, 636 F. App'x 532, 537 (11th Cir. 2016) (noting that the witness "was not a casual or passing observer, rather he directly engaged with" the defendant (internal quotation marks omitted)).

Third, the witness's prior description of the criminal weighs in favor of reliability. *See Neil* 409 U.S. at 199. Before seeing a photo of Kirkman during the May 2019 interview, Individual-1 described Kirkman as a "[b]lack guy," about forty years old, from Alabama, about five feet and ten inches tall, and roughly 230–40 pounds.[11] [Doc 124-1 at 12]. This description was largely accurate, only missing

---

[11] The Court notes that Kirkman argues that Individual-1 was also shown a picture of Kirkman prior to the May 2019 interview, so his description was based on that photo, not on his own experiences. [Doc. 174 at 29]. But, there is no record of the January or February 2019 interviews with Individual-1, and the questioning agents testified that no photos were shown to Individual-1 during the January 2019 interview and that, during the February 2019 interview, Individual-1 was only shown photos of contraband and Shackelford. [Doc. 128 at 34–36, 202, 203].

Kirkman also argues that Individual-1 previously saw Kirkman's photo at the Prison before his May 2019 interview because Individual-1 stated, "they had his picture—right before I left they had all their pictures up there." [Doc. 124-1 at 18]. But, this comment was made in the midst of a conversation concerning "School Boy," not Kirkman, and Individual-1 did not elaborate on who he was shown photos of. And, Individual-1 did not make any statements suggesting that he had seen the photo of Kirkman before the May 2019 interview.

Regardless, the Court finds that the government has carried its burden in establishing "by clear and convincing evidence that the [May 2019 and August 2020] identifications were based upon observations of the suspect other than the [tainted] identification." *United States v. Wade*, 388 U.S. 218, 240 (1967). Individual-1 and Individual-2 both testified at length regarding Individual-1's interactions with Kirkman. [Doc. 128]. Additionally, the lapses in time between the interviews make it unlikely that Individual-1 was merely describing the photo he was shown. For example, there were more than three months between the unrecorded 2019 interviews and the May 2019 interview, and there was more than a year between the August 2020 interview and the 2019

Kirkman's age by a few years. [Doc. 145 at 10]. Kirkman argues that the description is incomplete because Individual-1 did not mention Kirkman's prominent tattoos. And, while this omission does lessen the specificity of the description, the Court finds that the description was still "reasonably accurate." *United States v. Dixon*, 401 F. App'x 491, 494 (11th Cir. 2010); *see, e.g.*, *United States v. Caldwell*, 963 F.3d 1067, 1079 (11th Cir. 2020) ("while eyewitnesses did not mention [the defendant's] tattoos . . . the remaining matching characteristics, as well as [additional evidence], heavily outweigh this discrepancy").

Four, the level of certainty demonstrated by the witness at the confrontation weighs in favor of reliability. *See Neil* 409 U.S. at 199. During the May 2019 interview, Individual-1 volunteered the name "Pat" without prompting from the interviewing agents and identified a photo of Patrick Kirkman as "Pat." [Doc. 124-1 at 12–13]. The questioning agent testified that Individual-1 did not show any hesitation or confusion when identifying Kirkman during this interview. [Doc. 128 at 41]. Then, at the August 2020 interview, Individual-1 identified Kirkman in two photo lineups and indicated that he was "[o]ne hundred percent positive" in his

---

unrecorded interviews. *See e.g.*, *United States v. Carter*, 410 F.3d 942, 949 (7th Cir. 2005) (reasoning that a three-month gap between photo showings made the first showing unlikely to influence the witness or lead to misidentification). Accordingly, Kirkman's argument regarding a photo shown during the earlier interviews is without merit.

identification.[12] [Doc. 124-3 at 79]. As Individual-1 was certain of his identifications, the Court finds this factor satisfied. *See Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987).

Finally, the length of time between the crime and identification weighs in favor of reliability. *See Neil* 409 U.S. at 199. The contraband scheme lasted from June 2018 until February 2019, and Individual-1's first identification occurred in May 2019. [Doc. 1 at 1].  Since only three months elapsed between the end of the alleged crime and Individual-1's identification, the Court does not find the length of time to be indicative of an unreliable identification. *See, e.g.*, *United States v. Douglas*, 489 F.3d 1117, 1127 (11th Cir. 2007) (finding that eight months between the crime and identification was "not so long as to lead to the conclusion that the identification was unreliable"). Additionally, while eighteen months elapsed between the end of the alleged crime in February 2019 and Individual-1's August 2020 identification, this lapse in time at most weighs lightly against reliability.[13] *See United States v. Jean*, 315 F. App'x 907, 913 (11th Cir. 2009) (holding that an

---

[12] Kirkman challenges the reliability of Individual-1's identification by arguing that Individual-1 also misidentified another person as Kirkman. [Doc. 174 at 32]. But, Kirkman did not positively identify the man in the photo. He stated that the person looked like a police officer and looked like Kirkman, but he could not tell with the glasses. [Doc. 124-3 at 113]. He emphasized his uncertainty, saying, "I really can't tell. It does and it don't." [*Id.*].

[13] The Court notes that Kirkman argues that the scheme actually ended in December 2018 because of the shut down at the Prison. Setting aside that Individual-1 did not say that the three month shut down was at the end of the six month period, the Court still finds that six months between the criminal conduct and the identification would weigh in favor of finding reliability.

identification was admissible despite six years passing between the crime and identification).

Applying the *Biggers* factors, the Court concludes that the May 2019 identification is sufficiently reliable, and therefore the August 2020 identification was not tainted. Accordingly, both the May 2019 and August 2020 out-of-court identifications, and in-court identifications by Individual-1, are admissible.

### iii. Analysis of Individual-2's Identification

Individual-2 first identified Kirkman after being shown a single photo, which the Court has already identified as an unduly suggestive identification procedure. So, the Court must now determine whether this identification was reliable.

The Court first concludes that the first factor—opportunity of the witness to view the criminal at the time of the crime—weighs in favor of reliability. *See Neil* 409 U.S. at 199. Individual-2 delivered contraband with Individual-1 to Kirkman for months. [Doc. 124-5 at 155]. Although Individual-2 admitted that he primarily acted as a lookout during these drop-offs and that he and Individual-1 were moving as quickly as possible, he clarified that he saw Kirkman "practically every time [they] took the contraband up to the units." [*Id*. at 189]. Additionally, Individual-2 was introduced to Kirkman by Individual-1, saw Kirkman and Individual-1 talking "all the time," and saw Kirkman "other times just in the chow hall or in the commissary or out on the yard or something." [*Id*. at 155–56, 189]. These interactions provided

more than sufficient opportunity for Individual-2 to view Kirkman. *See, e.g.*, *United States v. Daniels*, 97 F.4th 800, 810 (11th Cir. 2024) (holding that the identification was admissible despite the witness only seeing and interacting with the defendant one time).

Second, Individual-2 paid close attention to Kirkman. He testified to seeing Kirkman many times throughout the Prison and knew which cell Kirkman frequented in addition to participating in the smuggling scheme with Kirkman. [Doc. 128 at 189]; *See, e.g.*, *United States v. Porter*, 221 F. App'x 836 (11th Cir. 2007) (explaining that the identification was reliable when witnesses had "reason to remember" the defendant after participating in drug deals with him).

Third, the accuracy of prior description and the length of time between the crime and identification weigh against reliability. *See Neil* 409 U.S. at 199. Individual-2 did not provide a description of Kirkman prior to being shown a photo of him at the July 2021 interview. [Doc. 124-5 at 182]. Additionally, the contraband scheme ended in February 2019, and Individual-2's identification took place in July 2021. [Doc. 1 at 1]; [Doc. 124-5].

But, these factors are not dispositive because the level of certainty demonstrated by the witness weighs in favor of reliability. Individual-2 testified that he was very confident in his identification of Kirkman during his prior interview. [Doc. 128 at 161]. He also testified that although it had been a few years since he

20

had seen Kirkman, he knew him when he saw him, and he also provided an accurate description of Kirkman at the hearing.[14] [*Id*. at 156, 191]. The Court finds that their status as alleged co-conspirators, Individual-2's knowledge of the precise cell often housing Kirkman, and Individual-2's certainty in making the identification outweigh any concerns created by the third and fifth factors. *See e.g.*, *United States v. Johnson*, 2015 U.S. Dist. LEXIS 171143 at *8 (N.D. Ga. July 15, 2015) ("[while] unfortunate that the agent did not ask [witness] to provide a physical description of [defendant] prior to displaying any photograph . . . the record includes other facts that support the accuracy and reliability of [witness's] recollection."). Accordingly, Individual-2's out-of-court and in-court identifications are admissible.

### IV.    Conclusion

After considering the Report and Recommendation [Doc. 158], the Court receives the R&R with approval and adopts its findings and legal conclusions as the Opinion of this Court. Accordingly, Shackelford and Kirkman's Motion for Bill of Particulars [Docs. 57] is **DENIED**, Shackelford and Kirkman's Motions to Dismiss

---

[14] Kirkman argues that Individual-2 description and certainty were products of Individual-2 seeing Kirkman outside of the courtroom before the identification. [Doc. 128 at 139]. The only record of this sighting is defense counsel's description of her concern prior to cross-examining Individual-2. [*Id*.]. Notably, Individual-2 did not testify that his identification was impacted by this meeting. Regardless, this brief interaction does not change the Court's decision. *Cf. United States v. Rogers*, 387 F.3d 925, 937 (7th Cir. 2004) (noting that "accidental encounters between a witness and suspect [have been found] to be non-suggestive"). Individual-2 had substantial interactions with Kirkman prior to his interview identifications, and the Court is satisfied in the reliability of these identifications.

[Docs. 58, 59] are **DENIED**, and Kirkman's Motion to Suppress [Doc. 72] is **DENIED**. Additionally, Kirkman's Motion to Extend Time for Filing Objections [Doc. 163] is **GRANTED**, and the Government's Motion to File Oversized Response Brief [Doc. 185] is **GRANTED**.

 **IT IS SO ORDERED**, this 22nd day of July, 2024.

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE